UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

FREDERICK ANTHONY CARGILL,
*Defendant-Appellant.*

No. 95-5740

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

WILBERT ANTHONY NEAL,
*Defendant-Appellant.*

No. 95-5741

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RONALD CHRISTOPHER NEAL,
*Defendant-Appellant.*

No. 95-5777

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CHRISTOPHER LEE NEAL,
*Defendant-Appellant.*

No. 95-5871

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.                        No. 97-4428

CHRISTOPHER LEE NEAL,
          *Defendant-Appellant.*


UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.                        No. 97-4429

WILBERT ANTHONY NEAL,
          *Defendant-Appellant.*


UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.                        No. 97-4430

RONALD CHRISTOPHER NEAL,
          *Defendant-Appellant.*


UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.                        No. 97-4434

FREDERICK ANTHONY CARGILL,
          *Defendant-Appellant.*

UNITED STATES OF AMERICA,
                *Plaintiff-Appellant,*

                v.

WILBERT ANTHONY NEAL;                      No. 99-4671
CHRISTOPHER LEE NEAL; RONALD
CHRISTOPHER NEAL; FREDERICK
ANTHONY CARGILL,
                *Defendants-Appellees.*

Appeals from the United States District Court
for the Middle District of North Carolina, at Greensboro.
James A. Beaty, Jr., District Judge.
(CR-94-300)

Argued: September 27, 2000

Decided: September 6, 2001

Before WIDENER, WILKINS, and MICHAEL, Circuit Judges.

_____

Reversed in part, affirmed in part, vacated in part, and remanded by
unpublished per curiam opinion. Judge Widener wrote a dissenting
opinion.

_____

**COUNSEL**

**ARGUED:** Lawrence Patrick Auld, Assistant United States Attorney,
Greensboro, North Carolina, for United States. John Joseph Korzen,
SMITH, HELMS, MULLISS & MOORE, Greensboro, North Caro-
lina, for Cargill, et al. **ON BRIEF:** Walter C. Holton, Jr., United
States Attorney, Clifton T. Barrett, Assistant United States Attor-
ney/Chief, Criminal Division, Paul A. Weinman, Assistant United
States Attorney, Greensboro, North Carolina, for United States. Lisa

S. Costner, TISDALE, GRACE, MENEFEE & COSTNER, P.A., Winston-Salem, North Carolina; James B. Craven, III, Durham, North Carolina, for Ronald Neal; Lawrence J. Fine, Winston-Salem, North Carolina; Anne R. Littlejohn, Greensboro, North Carolina, for Wilbert Neal; Danny T. Ferguson, Winston-Salem, North Carolina; Brian M. Aus, Durham, North Carolina, for Christopher Neal.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Anthony Neal, Ronald Neal, Christopher Neal, and Frederick Cargill (the defendants) were convicted of conspiring to distribute cocaine base (crack). Christopher Neal was also convicted of three separate drug-related offenses. At trial the government introduced the testimony of Lee Marvin Settle who gave false testimony regarding his involvement in a different drug conspiracy. Although the government knew or should have known that this aspect of Settle's testimony was false, the government failed to inform the defendants or the district court of the falsity of this testimony and attempted to bolster Settle's credibility on redirect examination and in closing argument. The defendants moved the district court for a new trial on the grounds that the government knowingly allowed false testimony to pass uncorrected. The district court entered an order denying the motion for a new trial, and the defendants appealed. Thereafter, we vacated the order and remanded with instructions that the district court conduct additional factfinding. *See United States v. Cargill*, No. 95-5740, 1998 WL 39394, at *5 (4th Cir. Feb. 2, 1998) (per curiam).

On remand the district court found that the government permitted Settle's false testimony to pass uncorrected and concluded that there was a "reasonable likelihood that the jury could have reached a different verdict if Settle's false testimony had been brought to the attention

of the jury." The court, as a result, granted the defendants' motion for a new trial. The government filed a timely notice of appeal. We agree with the district court that the government allowed Settle's false testimony to pass uncorrected. We hold, however, that the district court abused its discretion when it granted the defendants a new trial. Because we find that it was clear beyond a reasonable doubt that a jury would have found the defendants guilty without Settle's testimony, we conclude that there is no reasonable likelihood that Settle's false testimony could have affected the judgment of the jury. Accordingly, we reverse the district court's new trial order with instructions to reinstate the defendants' judgments of conviction.

We also have before us an appeal from the defendants. Christopher Neal's arguments are without merit, and the district court is instructed to reinstate his sentence. We conclude, however, that the district court improperly applied a two-level enhancement to Frederick Cargill's sentence under *U.S. Sentencing Guidelines Manual* § 2D1.1(b)(1). We also conclude that the district court should reconsider a two-level enhancement that was applied to Anthony Neal's sentence pursuant to *U.S. Sentencing Guidelines Manual* § 2D1.1(b)(1) because the enhancement was based on the testimony of Lee Marvin Settle, whose credibility is subject to question. In addition, we hold that Frederick Cargill's, Anthony Neal's, and Ronald Neal's sentences are in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). For all of these reasons, we remand for resentencing as to Cargill, Anthony Neal, and Ronald Neal.

I.

The defendants, Anthony Neal, Christopher Neal, Ronald Neal, and Frederick Cargill, were indicted along with Thomas Neal, James King, Daryl Simpson, Milton Faircloth, and Kevin Jones, for conspiracy to distribute crack in violation of 21 U.S.C. §§ 846, 841(b)(1)(A). In addition, Christopher Neal was indicted for distributing crack in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2; using a person under eighteen years of age to distribute crack in violation of 21 U.S.C. §§ 861(a)(1), 841(b)(1)(B); and carrying and using a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), (2).

At the defendants' trial in this case the government relied heavily on the testimony of Lee Marvin Settle. In an earlier case Settle pled guilty to an indictment that charged him with participating in a drug conspiracy with Larry Angelo "Todd" Johnson. Johnson was also indicted, and he was prosecuted by the same Assistant United States Attorney who later prosecuted the defendants in this case. (We will refer to this Assistant United States Attorney as the "AUSA.") At Johnson's trial the AUSA introduced evidence, including the testimony of two witnesses, that established Settle's involvement in Johnson's drug operations. The first witness, Robert Reid, testified that Settle and Johnson conducted drug operations and were "hanging partners." Reid also said that both Settle and Johnson warned him not to testify against Johnson and threatened him with physical harm when he said that he wanted to get out of the drug business. The second witness, Tracy Taylor, said that Settle collected money from her to pay a drug debt to Johnson and that the two men took turns making drug runs. In addition, Johnson's presentence report contained a statement from one of Settle and Johnson's coconspirators, Charles Williamson, who said that he had witnessed Johnson obtain crack from Settle on several occasions. Finally, Settle admitted to a federal agent that he had accompanied Johnson on trips to Florida to establish drug connections, that he had aided Johnson in a shooting incident, and that he had provided cocaine to Johnson at wholesale prices.

When Johnson appealed his sentence to this court, the AUSA argued forcefully that Settle was a member of Johnson's conspiracy. The AUSA argued to us that Johnson's sentence enhancement for leading a conspiracy of five or more people was appropriate because Settle was one of the five members of the conspiracy. The AUSA argued that Reid's and Taylor's testimony regarding Settle's involvement with Johnson was credible. "While [Settle] was described as [Johnson's] 'hanging partner,' the evidence showed that his role went well beyond that," according to the AUSA. Finally, the AUSA noted that "when [Johnson] visited Reid to warn him what would happen if Reid were to testify against [Johnson], [Settle] was with [Johnson]."

After Johnson's appeal was over, Settle testified against the defendants in this case, hoping to obtain a substantial assistance motion from the government. According to Settle, he became involved in the defendants' conspiracy in 1993. He testified that he relocated from

Pennsylvania to Reidsville, North Carolina, in June 1993. He had been implicated in a shooting in Harrisburg, Pennsylvania, and fled to North Carolina to escape aggravated assault and reckless endangerment charges. Settle quickly became involved in the local drug business and met the defendants. Anthony Neal told Settle that he and his brothers (Christopher, Ronald, and Thomas) were in the drug business and that they had the town of Reidsville, North Carolina, "locked down."

Settle testified that he began pooling his money with Anthony Neal, Thomas Neal, Ronald Neal, Christopher Neal, Frederick Cargill, Milton Faircloth, and others to fund drug runs to New York. According to Settle, he, Anthony and Christopher Neal, and Cargill would drive up Interstate 81 through Harrisburg and then go on to New York City via Interstate 78. They would begin the trip with a car with North Carolina plates and then switch to a car with Pennsylvania plates at the house of Settle's girlfriend (Christine Ness) in Harrisburg. Settle testified that they switched cars and avoided Interstate 95 and the New Jersey Turnpike to escape police detection. During their return from New York, the men would store the drugs in a spare tire. After they reached Ness's house, they would transfer the spare tire to the North Carolina car. Once they arrived at home, they would remove the drugs with a tire changer at an auto shop owned by Anthony Neal's father at Moyer Lane. The drugs were then stored in the woods until they were cooked into crack. The men would then divide the drugs based on their financial contribution and would usually distribute the drugs individually.

In addition, Settle testified that a house owned by Ronald Neal at 709 Edwards Street in Reidsville was the nerve center of the drug operation. On one occasion, Anthony Neal held a meeting at 709 Edwards and decided to send a woman on a drug run to New York. The drug run was funded by the Neals (Anthony, Thomas, Ronald, and Christopher), Settle, and Cargill, among others. Anthony told Settle that the woman lost the money and did not buy the drugs. When the woman returned to North Carolina, Anthony assaulted her and forced her to return to New York with him, Thomas Neal, Settle, and Cargill in an effort to retrieve the money. After the men realized that she had lied about losing the money, all four of them beat her and then returned to North Carolina.

Settle also testified that in December 1993 Frederick, Thomas, Christopher, and Anthony Neal met at 709 Edwards and planned another drug run to New York. A few days later, Anthony was arrested for drug possession in Louisville, Kentucky. Anthony called Settle from jail and told him that he, Christopher, and an anonymous drug supplier had picked up Vanetta Totten in Florida and had gone from there to the Bahamas expecting to arrange a deal for a cheap source of cocaine. The deal in the Bahamas fell through, but the anonymous supplier indicated that he had other sources in Louisville. Before going to Kentucky, Anthony dropped Christopher off in North Carolina and then traveled with Totten and the supplier to New York where Anthony bought cocaine powder. The three (Anthony, Totten, and the supplier) traveled directly from New York to Louisville to obtain more cocaine powder, but Anthony and Totten were arrested in a McDonald's parking lot before they made an additional buy.

After Settle's testimony the defendants' lawyers inquired into his history of drug dealing in an effort to impeach his credibility. Settle repeatedly denied that he was Todd Johnson's partner or that he was involved in Johnson's drug ring. For example, on cross-examination by Anthony Neal's and Frederick Cargill's lawyers, Settle asserted that he was not a member of Johnson's conspiracy and that he only dealt drugs with Johnson on one occasion. On redirect examination the AUSA asked Settle to describe his involvement in Johnson's drug operations. Settle replied, "Basically none. At one point [Johnson] made bail or something, and he needed to get some weight to keep him going until he went to Florida and got his own connection, and I just gave him an ounce of cocaine to keep his workers going until he got back from Florida." On recross Settle again insisted that he was not Johnson's partner. In addition, he suggested that it was "simply a coincidence" that both he and Johnson were named in the same indictment.

Although the AUSA was aware of Reid's and Taylor's testimony from the Johnson case, which implicated Settle in Johnson's conspiracy, the AUSA never informed the defense or the district court that Settle's testimony might have been false. Instead, the AUSA made several attempts to bolster Settle's credibility. The AUSA's first effort to shore up Settle's credibility was on redirect examination:

AUSA:     Now [Christopher Neal's lawyer] asked you and you responded that you would lie to shorten your sentence?

Settle:   Yes.

AUSA:     Is lying in this case going to shorten your sentence?

Settle:   No.

AUSA:     What's going to happen to you if you lie in this case?

Settle:   I was notified that I would be—that perjury charges would be brought against me, and I would be prosecuted.

In his closing arguments the AUSA also indicated that Settle's testimony was credible because the opportunity to receive a substantial assistance motion gave him an incentive to tell the truth. The AUSA argued:

> Why should you believe Lee Marvin Settle? Because he came in here and placed his left hand on the Bible and raised his right and swore to tell the truth? I would submit you should believe him for two reasons; one is for perhaps the first and only time in his life it is in his own selfish interest to tell the truth. You had a chance to examine his plea agreement. If you want, you can look at it again. Any benefit that Mr. Settle hopes to derive in this case is not from getting Anthony Neal, and it's not from getting Chris Neal or Ron Neal or Frederick Cargill. Any benefit that Lee Marvin Settle hopes to gain in this case is from telling the truth — from testifying truthfully. The second reason is all the evidence . . . that supports, corroborates his testimony.

The jury convicted the defendants of conspiring to distribute crack. In addition, Christopher Neal was found guilty on the separate sub-

stantive counts. The defendants received sentences ranging from 292 months to life imprisonment.

The defendants moved the district court for a new trial on the basis of newly discovered evidence, specifically, that the government allowed Settle's false testimony to pass uncorrected.[1] The district court denied the motion, and the defendants appealed to this court. *See United States v. Cargill*, No. 95-5740, 1998 WL 39394 (4th Cir. Feb. 2, 1998) (per curiam). In that first appeal we vacated the district court's order and remanded with instructions that the court conduct additional factfinding. In particular, we asked the district court to determine whether Settle testified falsely about his involvement in the Johnson conspiracy, whether the AUSA knew about the falsity of Settle's testimony, and whether the AUSA informed the defense that Settle had testified falsely. *See id.* at *5. We said that if the district court concluded that the AUSA knowingly allowed false testimony to pass uncorrected, the district court should determine whether Settle's "false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Id.* at *5 (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)) (internal quotation marks and citation omitted).

On remand the district court conducted a thorough hearing and ultimately granted the defendants a new trial. First, the court found that Settle's testimony was false and created a false impression regarding the extent of his involvement in Johnson's drug operations. Second, the court found that the AUSA knew or should have known that Settle's testimony was false and that the AUSA failed to inform the defense about the situation. Third, the court found that Settle was "the Government's primary witness" who "described the internal workings of the Defendants' organization and their method of operation." It also noted that "[w]ithout Settle's testimony, the Government's case would not have been as overwhelming." Finally, the district court concluded that there was a "reasonable likelihood that the jury could have reached a different verdict, if they had known . . . that Settle was

---

[1]The defendants did not learn of the existence of Reid's and Taylor's testimony in the earlier, Johnson case until after the defendants' trial had concluded.

giving false testimony." As a result, the court granted the defendants' motion for a new trial. The government appeals that ruling.

## II.

We review questions of law, such as whether the district court applied the proper legal standards, de novo. *Church v. Attorney Gen. of Va.*, 125 F.3d 210, 215 n.5 (4th Cir. 1997); *see also United States v. Huddleston*, 194 F.3d 214, 218 (1st Cir. 1999); *United States v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995); *United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993). If the district court applied the proper legal standards, its decision to grant a new trial is reviewed for an abuse of discretion. *See United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995); *see also Huddleston*, 194 F.3d at 218.

The government raises four challenges to the district court's decision. First, the government argues that the defendants have to prove that Settle committed perjury. Second, it argues that the defendants must demonstrate that it intentionally used Settle's perjured testimony to obtain a conviction. Third, it claims that it properly informed the defense of Settle's false testimony. Finally, it claims that there was no reasonable likelihood that the jury could have reached a different verdict if it had known that Settle testified falsely.

## A.

The government argues that the district court used the wrong standard to evaluate Settle's testimony. The court said that the defendants had to show that Settle's testimony "was in fact false or created a false impression regarding a material fact." The government claims, however, that the defendants must prove that Settle committed perjury. In any case, the government claims that reasonable minds could dispute whether Settle testified falsely and that a "close reading" of the record demonstrates that his testimony was accurate.

The government's view notwithstanding, the defendants must only show that Settle proffered false testimony, not that he committed perjury. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that a new trial is required when the government's knowing use of

"false testimony" could affect the judgment of the jury); *Napque v. Illinois*, 360 U.S. 264, 269 (1958) (recognizing the "principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"). Prosecutorial misconduct occurs "not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact." *Hamrick v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967). This court has recognized that "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987). Settle's testimony is therefore false if it was perjured *or* "create[d] a false impression of facts which are known not to be true." *Hamrick*, 386 F.2d at 394. *See also United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995); *United States v. Iverson*, 637 F.2d 799, 805 n.19 (D.C. Cir. 1980); 5 Wayne R. LeFave, et al., *Criminal Procedure* 497 (1999) ("As lower courts have noted, it matters not whether the witness giving false testimony was mistaken or intentionally lying. If the prosecution knows that the witness's statement is untrue, it has a duty to correct it.").

We agree with the district court that Settle's testimony was false and gave the jury a false impression of material fact. The record shows that Settle testified falsely when he stated that he was "not partners with" Larry Angelo Johnson and that his involvement in Johnson's drug ring was "basically none." At Johnson's trial Robert Reid testified that Johnson and Settle were "hanging partners" and ran a drug operation together. Reid also said that Settle accompanied Johnson to Reid's house to threaten Reid with physical harm when Reid indicated that he wanted out of their drug ring. Another witness at Johnson's trial, Tracy Taylor, testified that Settle collected drug money for Johnson, that Johnson and Settle had "business dealings together as far as the drugs," and that Settle and Johnson would take turns making drug runs to Florida. Johnson's presentence report contains a statement from Charles Williamson that he observed Johnson obtain drugs from Settle on at least three occasions. Finally, Settle admitted to a government agent that he participated in Johnson's drug operations.

In addition, litigation statements and testimony of the AUSA indicate that Settle's trial testimony was false. When Johnson appealed

his conviction, the AUSA argued to this court that Settle was involved in Johnson's conspiracy. Johnson had appealed the upward adjustment of his sentence, which was made on the ground that he organized five or more people in a drug ring. The AUSA urged this court to credit Reid's and Taylor's testimony about Johnson's relationship with Settle. The AUSA contended, "While [Settle] was described as [Johnson's] 'hanging partner,' the evidence showed that his role went well beyond that." Furthermore, the AUSA conceded at the district court hearing in this case that Settle's trial testimony was contrary to the earlier testimony of Reid and Taylor. At the hearing the AUSA was asked if he thought Settle's testimony was consistent with the testimony of Reid and Taylor. He responded:

> If you accept as entirely true, absolutely true, the answers that Reid and Taylor gave in the Johnson trial and that the one . . . question that Settle was asked about his involvement with Todd Johnson as being all of his involvement with Todd Johnson, then no, they would not be consistent.

The preceding evidence is more than sufficient to support the district court's finding that Settle testified falsely and gave a false impression of material fact. The testimony and statements of several persons, including the AUSA, demonstrate that Settle's involvement in Johnson's drug ring was more than "basically none." We therefore reject the government's argument that reasonable minds could differ about whether Settle testified falsely.

## B.

The government contends that the district court applied the wrong standard in determining whether the AUSA knew that Settle offered false testimony. The district court said that the government engaged in prosecutorial misconduct if it either "knew or should have known that Settle's testimony was false." According to the government, however, the defendants must show that it intentionally offered false testimony to secure their convictions. In any event, the government argues that it did not knowingly allow Settle's false testimony to pass uncorrected. The government notes that Settle admitted on cross-examination that he had pled guilty to conspiring with Johnson. Thus, it asserts that it did not have any reason to believe that Settle had testi-

fied falsely because he responded candidly to the defendants' line of questioning. We reject the government's arguments.

We have never required a defendant to prove that the government deliberately used false testimony. In *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994), we held that a violation of due process occurs when the government solicits testimony that it "knew or should have known to be false or simply allowed such testimony to pass uncorrected." In addition, the AUSA's conduct here belies the government's assertion that he did not know or had no reason to know that Settle's testimony was false. At Johnson's trial the AUSA took steps to prove that Settle was a part of Johnson's drug ring. For example, he offered the testimony of Reid and Taylor who claimed that Settle was Johnson's partner. And, when Johnson appealed his conviction to this court, the AUSA claimed that Settle was thoroughly immersed in Johnson's drug operations. His brief said that Settle was more than Johnson's "hanging partner" and urged that Johnson's sentencing enhancement for an aggravating role was appropriate because Settle counted in the group of five or more that was organized or led by Johnson. The AUSA's strategy and arguments at Johnson's trial and appeal demonstrate that he knew (or should have known) that Settle testified falsely at the defendants' trial. Based on the all of the foregoing, we have no basis for disturbing the district court's finding that the AUSA "knew or should have known at the time of Defendants' trial that Settle's testimony was false and created a false impression of fact for the jury."

## C.

The government next argues that the district court erroneously found that the government failed to inform the defendants of Settle's false testimony. The district court noted that the government had a duty to inform the defendants of the falsity of Settle's testimony after Settle had testified. The government claims, however, that it fulfilled this duty. The government points out that the AUSA made several disclosures to the defendants' lawyers at a pretrial conference. At the conference the AUSA gave the defendants' lawyers a binder containing Settle's statements to government agents. In addition, the government says that the AUSA told the lawyers at the conference that they could inspect the entire Johnson file. Because the AUSA offered the

defendants information before trial that contradicted Settle's trial testimony, the government asserts that it fulfilled its duty to inform the defendants of Settle's false testimony under the rule in *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990) (noting that the "*Brady* rule does not apply if the evidence in question is available to the defendant from other sources") (internal citations and quotation marks omitted)).

The government's reasoning is flawed. The rule announced in *Wilson* is simply not applicable here. In *Wilson* the defendants alleged a violation of the *Brady* rule, which prohibits the government from suppressing evidence favorable to the defense. *See Wilson*, 901 F.2d at 380. This court indicated that *Brady* does not apply when a defendant has access to the undisclosed evidence from other sources. *See id.* As the district court correctly noted, however, this case is not a "run-of-the-mill *Brady* claim." The defendants have alleged that the government knowingly offered the false testimony of a material witness, and, as we said in the first appeal, this is a claim of "greater seriousness." *United States v. Cargill*, No. 95-5740, 1998 WL 39394, *5 (4th Cir. Feb. 2, 1998) (per curiam). The government is always under a strict duty to inform a defendant of false testimony by one of its witnesses. *See, e.g.*, *California v. Trombetta*, 467 U.S. 479, 485 (1984) (imposing "upon the prosecution a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath"); *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994) (violation of due process occurs when government allows false "testimony to pass uncorrected"); *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988) ("The fact that defense counsel was also aware of the [evidence] but failed to correct the prosecutor's misrepresentation is of no consequence. This did not relieve the prosecutor of her overriding duty of candor to the court, and to seek justice rather than convictions.").

We agree with the district court that the government failed to fulfill its duty to inform the defendants of Settle's false testimony. Although the AUSA gave the defendants' lawyers a binder containing Settle's earlier statements (along with other materials) and suggested that the lawyers look at the Johnson file, these pretrial disclosures were insufficient. Once Settle testified falsely, the AUSA was under a duty to inform the defendants of that fact. The AUSA simply failed in that

duty. At the hearing the AUSA admitted that he did not disclose Set-
tle's false testimony to the defendants and that he did not direct
defense counsel to relevant evidence in the Johnson file:

> Defense lawyer: During or after Settle's testimony, did you
> inform the Court or defense counsel about
> the testimony of Reid and Taylor or the
> statement of Williamson in the Johnson
> case?

> AUSA:           During or after, no, I did not.

> Defense lawyer: Did you inform the Court or defense coun-
> sel of the Fourth Circuit brief that had been
> filed in April '95, one month before trial,
> and the Government's position about Settle
> in that brief?

> AUSA:           No.

The district court did not err in its finding that the government knew
or should have known that Settle testified falsely and that it failed to
inform the defendants of Settle's false testimony. As the district court
said, the AUSA simply let Settle's testimony "pass to the jury uncor-
rected."

## D.

The foregoing discussion establishes that the government has
engaged in prosecutorial misconduct. The government nevertheless
argues that the district court improperly granted the defendants a new
trial. Again, the district court's decision to grant a new trial is
reviewed for an abuse of discretion. *See United States v. Singh*, 54
F.3d 1182, 1190 (4th Cir. 1995).

Because the district court held that the government knowingly per-
mitted Settle's false testimony to pass uncorrected, it applied the
*Giglio* test to determine whether a new trial was appropriate. The
court correctly noted that under *Giglio* the defendants would be enti-

tled to a new trial if Settle's false testimony could "in any reasonable likelihood" have affected the judgment of the jury. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). The district court added that the *Giglio* standard is "less strict than the test used for violations of *Brady v. Maryland*, under which defendants must establish a 'reasonable probability' that with favorable evidence the defendant would have obtained a different result at trial." The court then found that Settle was the government's primary witness and that knowledge of his false testimony could have swayed the jury. According to the district court:

> Settle was the Government's primary witness who provided information about the recent activities of the Defendants' drug conspiracy. Settle also explicitly described the internal workings of Defendants' organization and their method of operation. Without Settle's testimony, the Government's case would not have been as overwhelming. . . .
>
> The fact that Settle provided false testimony about his relationship with Johnson could have created a credibility concern for the jury as to the truthfulness of Settle's testimony regarding his relationship with Defendants and the nature of their drug operations . . . . [T]he jury could have disbelieved him altogether in his description of the significant level of Defendant's drug activities.

Based on these observations, the district court concluded that there was a reasonable likelihood that knowledge of Settle's false testimony could have affected the judgment of the jury.

The district court applied the correct standard, as the government concedes, when it said that the defendants are entitled to a new trial if Settle's "'false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154 (quoting *Napque v. Illinois*, 360 U.S. 264, 271 (1959)). The district court is also correct when it notes that the *Giglio* standard is less onerous than the *Brady* one. Under *Brady* a new trial is granted only when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to

undermine confidence in the outcome." *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990) (internal quotation marks and citation omitted). Because the government's knowing use of false testimony is more serious than a *Brady* violation and "involves 'a corruption of the truth-seeking function of the trial process,'" the "reasonable likelihood" standard is proper. *United States v. Bagley*, 473 U.S. 667, 680 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)). Under the reasonable likelihood test the government's knowing use "is considered material unless failure to disclose it would be harmless beyond a reasonable doubt." *Id.* at 679-80. Most courts have agreed that the "reasonable likelihood" test is more favorable to defendants than the *Brady* "reasonable probability" standard. *See United States v. Rodriguez*, 162 F.3d 135, 146 (1st Cir. 1998); *United States v. Steinberg*, 99 F.3d 1486, 1490-91 (9th Cir. 1996); *United States v. Gonzales*, 90 F.3d 1363, 1368 n.2 (8th Cir. 1996); *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir. 1995); *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995); *Kirkpatrick v. Whitely*, 992 F.2d 491, 497 (5th Cir. 1993); *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986); *United States v. Kluger*, 794 F.2d 1579, 1582 n.4 (10th Cir. 1986). *But see United States v. Boyd*, 55 F.3d 239, 245 (7th Cir. 1995).

The government makes three arguments in support of its position that there is no reasonable likelihood that a jury could have reached a different verdict if it had been informed of Settle's false testimony. First, the government claims that evidence of Settle's false testimony does not bear a direct relationship to the defendants' guilt or innocence. Second, it claims that the defendants' line of impeachment was effective and that evidence of Settle's false testimony would have been cumulative. Finally, it claims that even if the jury had discredited Settle's testimony, there was sufficient evidence for the jury to convict the defendants.

1.

The government asserts that the district court erred in granting a new trial because Settle's testimony did not "bear a direct relationship to the defendants' guilt or innocence." The government bases this argument on the fact that Settle's false testimony only pertains to his

involvement in the Johnson conspiracy, which did not bear a direct relationship to what the defendants did or did not do in this case.

The government is wrong to argue that false testimony must be directly related to the guilt or innocence of a defendant. In *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994), we held that a defendant does not have to show a direct relationship between a witness's false testimony and a defendant's guilt or innocence:

> Even if the false testimony relates only to the credibility of a Government witness and other evidence has called that witness' credibility into question, a conviction must be reversed when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

*Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Thus, a new trial is proper if the false testimony undermines a witness's credibility and there is any reasonable likelihood that the false testimony could have affected the jury's verdict.

2.

The government further asserts that evidence of Settle's false testimony about his involvement with Johnson's drug ring would have been cumulative and would not have bolstered the defendants' line of impeachment. The government begins by noting that Settle admitted in his testimony that he had pled guilty to an indictment that named him and Johnson as coconspirators in a drug operation. In addition, the government claims that the defendants' impeachment of Settle was extensive. Specifically, the defendants brought out information about Settle's dubious past and his prior convictions.

The government underestimates the significance of Settle's false testimony. In *Kelly* we held that even if other evidence impeached the credibility of the witness, false testimony is ultimately material if it had any reasonable likelihood of affecting the judgment of the jury. *See Kelly*, 35 F.3d at 933. In this case if the jury had been informed that Settle lied on the stand, it might have discredited his testimony.

Although the defendants' lawyers elicited other impeachment evidence at trial, evidence of false testimony is a powerful form of impeachment. *See United States v. Wallach*, 935 F.2d 445, 457 (2d Cir. 1991) ("It was one thing for the jury to learn that [the witness] had a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie."). The government's knowing use of Settle's false testimony seriously impaired the jury's ability to assess his credibility. *See United States v. Bagley*, 473 U.S. 667, 680 (1985) (acknowledging that the government's knowing use of false testimony corrupts "'the truth seeking function of the trial process'" (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976))); *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) ("All perjury pollutes a trial, making it hard for jurors to see the truth."). Again, if the jury had known about Settle's false testimony, it could have been a critical factor in the jury's credibility determination.

The AUSA directly countered the defendants' efforts to impeach Settle when he urged the jury to credit Settle's testimony and insisted that Settle testified truthfully. During his closing argument the AUSA insisted that Settle had to testify truthfully in order to obtain a substantial assistance motion. The AUSA said specifically, "[a]ny benefit that Mr. Settle hopes to gain in this case is from telling the truth— from testifying truthfully." If the jury had known that Settle lied on the stand, the AUSA's efforts to rehabilitate him might have been futile. Because the AUSA essentially vouched for Settle's credibility and failed to inform the jury of Settle's false testimony, the government effectively prejudiced the jury's assessment of Settle's credibility. In these circumstances, we conclude that the district court was correct to reject the government's argument that juror knowledge of Settle's testimony would simply have been cumulative impeachment evidence.

3.

The government's final argument is that even if the jury had completely disbelieved Settle's testimony, there was more than sufficient evidence to convict the defendants. To analyze this argument, we must review the evidence introduced against the defendants. Because the reasonable likelihood standard essentially calls for harmless error

review, we must determine whether it is "'clear beyond a reasonable doubt that a rational jury would have found the defendant[s] guilty absent the error.'" *United States v. Brown*, 202 F.3d 691, 699 (4th Cir. 2000) (quoting *Neder v. United States*, 119 S. Ct. 1827, 1838 (1999)).

Although Settle was an important witness, the government offered the testimony of several other witnesses who also implicated the defendants in a sizeable crack cocaine conspiracy. In addition to Settle, Monte Dean Padgett and Thomas Williamson were the primary witnesses used to prove the conspiracy. The testimony of Christine Ness, Vanetta Totten, and several law enforcement officers also figured prominently in the government's case. Discounting Settle's testimony, we will summarize the evidence offered against the defendants.

Monte Dean Padgett testified that in 1989 he traveled to Moyer Lane (Southeast of Reidsville, North Carolina) with his friend, Ricky Shoemaker. Padgett said that Anthony, Christopher, Thomas, and Kevin Neal owned several trailers along Moyer Lane and also maintained (with their father) a small auto repair shop with a tire changing machine. Shoemaker introduced Padgett to Anthony Neal, who sold Padgett some powder cocaine. Thereafter, Padgett returned to Moyer Lane on a regular basis to buy cocaine powder and sometimes crack. Padgett typically purchased his drugs from Anthony, Thomas, Kevin, and Christopher Neal.

Padgett testified that he frequented the Moyer Lane area fairly often. He was present when a man named Brian Wilson traded a motorcycle to Anthony and Christopher Neal for crack. Padgett also witnessed Wilson trade a handgun to Anthony Neal (with Christopher Neal present) for cocaine. In addition, whenever Padgett sought to buy cocaine, Anthony, Christopher, Thomas, or Kevin Neal would go into the woods behind Moyer Lane and return with a quantity of the product. The drugs were stored in Mason jars that contained rice or beans to keep the drugs dry. Moreover, Anthony Neal told Padgett that he obtained his drugs from New York and Greensboro, North Carolina. Padgett also testified that he saw Christopher Neal cook cocaine in a trailer owned by James King, a coconspirator who was named in the defendants' indictment. On another occasion, Padgett entered a trailer on Moyer Lane and found Anthony and Christopher

Neal watching crack cocaine cool down at the end of the cooking process. After it had cooled, Padgett witnessed Anthony and Christopher Neal distribute the drugs on Pennsylvania Avenue in Reidsville, North Carolina.

Another witness, Thomas Williamson, testified that he met the Neals in February 1993, shortly before he became a drug dealer. Williamson said that he went to Darren Gwynn's house one evening, where he was introduced to Anthony, Thomas, and Ronald Neal. He saw Anthony Neal and Gwynn cooking crack, and he saw Anthony and Thomas Neal and Gwynn weigh it. Later in the evening Williamson saw Anthony Neal leave with the crack. Williamson testified that soon after he met the Neals, he started working as a drug distributor. He obtained quantities of crack from Anthony Neal until Anthony was arrested in Louisville. Williamson also bought a quantity of cocaine from Frederick Cargill. He frequently sold cocaine at and around 709 Edwards Street, which he said was the home of Ronald Neal. In addition, Williamson paid Ronald Neal a five- to ten-dollar commission on every sale he made. Williamson also bought crack from Faircloth, Ronald Neal, and Thomas Neal.

Christine Ness and Vanessa Totten also provided incriminating testimony. Christine Ness, Settle's girlfriend, testified that Anthony Neal, Christopher Neal, Frederick Cargill, and Settle would stop at her house in Harrisburg, Pennsylvania, on their way to New York City to buy drugs. Vanetta Totten testified that she accompanied Christopher and Anthony Neal on a drug-related trip to the Bahamas, Louisville, and New York. (The specific purpose of the trip to the Bahamas was to look for cheaper sources of cocaine.) Totten testified that she was arrested along with Anthony Neal in Louisville, Kentucky, after the police discovered that Anthony was in possession of powder cocaine.

In addition to the preceding witnesses, law enforcement officers testified that they conducted an extensive investigation that led to the arrest of the defendants and implicated them in the conspiracy. Reidsville police raided Ronald Neal's house at 709 Edwards Street on February 17, 1994, and seized quantities of crack cocaine that were discovered in several rooms. The police also found and arrested Milton Faircloth at the house, and they recovered scales, a police scanner,

a large amount of cash, and two firearms. On March 22, 1994, Ed Ragaukas, a New Jersey State Trooper, stopped Faircloth and Cargill heading south on the New Jersey Turnpike. When Trooper Ragaukas ordered Cargill out of the car, the Trooper noticed a bulge in his midsection, which turned out to be crack.

Working with law enforcement officials, Monte Dean Padgett bought crack from Christopher Neal on May 26, 1994. Padgett and Christopher Neal drove to 709 Edwards Street where Christopher walked into an area behind the house and returned to the car with over twenty-eight grams of crack. Several days later Padgett bought several grams of cocaine from Christopher by Moyer Lane in the company of an undercover officer. Padgett also helped set up an undercover bust of Christopher Neal that took place on October 6, 1994. He picked up Christopher Neal and Gerald Jones, a 16-year-old, in Reidsville. Padgett then dropped Christopher off near Moyer Lane. Christopher returned to the car and sold crack to Padgett for $700. They then proceeded to drive toward the Royal Inn where Christopher had intended to sell an ounce and a half of crack to an individual (the undercover officer) in exchange for firearms and cash. Christopher, however, abruptly ordered Padgett to drop him off at a Taco Bell. Christopher then told Jones to drive with Padgett to the Royal Inn and sell the cocaine. The exchange was made at the Inn and Jones was arrested. Christopher Neal was later apprehended near the Taco Bell, and the police found the $700 in his pocket.

On January 5, 1995, Frederick Cargill was arrested on this indictment at a young woman's residence. The police found crack near his feet and also an additional quantity that he had dropped out of a bedroom window.

Based on the foregoing evidence, we conclude that the district court's grant of a new trial for the defendants was an abuse of discretion. Even absent Settle's testimony, it is clear beyond a reasonable doubt that the jury would have found the defendants guilty of the drug conspiracy and Christopher Neal guilty of the separate counts against him. This becomes clear when the evidence against each defendant is collected from the witnesses other than Settle.

a.

Several witnesses other than Settle linked Anthony Neal to the conspiracy. Both Monte Dean Padgett and Williamson provided damaging testimony. Padgett testified that Anthony Neal, along with Christopher and Thomas Neal, would go into the same wooded location behind Moyer Lane to retrieve cocaine whenever Padgett wanted to make a purchase. Padgett also said that he saw Anthony and Christopher Neal wait for crack cookies to cool, and he then followed them to Pennsylvania Avenue in Reidsville, North Carolina, where they sold the crack. In addition, Padgett witnessed Anthony and Christopher Neal trade crack for a motorcycle on one occasion and for a firearm on another occasion. Another witness, Williamson, also implicated Anthony Neal in the conspiracy. He said that Anthony and Thomas Neal cooked and weighed crack at Gwynn's house, and Anthony left the house with the crack that they had made. Vanetta Totten also supported the government's case against Anthony Neal. She testified that she accompanied Christopher and Anthony Neal on the drug-related trip to the Bahamas and said that she witnessed the police arrest Anthony in Louisville for crack possession after the trip to the Bahamas. Totten's testimony corroborated the government's theory that Christopher and Anthony traveled to the Bahamas in search of new sources of crack.

b.

Much of the independent testimony that supports Anthony Neal's conviction also supports the conviction of Christopher Neal. The testimony of Padgett, the law enforcement officers, and Totten confirm that Christopher Neal was a member of the conspiracy. Padgett said that Christopher Neal, along with Anthony and Thomas Neal, went to the same location in the woods behind Moyer Lane to retrieve drugs. In addition, Padgett said that he witnessed Christopher Neal cooking crack in a trailer owned by one of the conspirators. He also testified that he watched Anthony and Christopher Neal wait for crack cookies to cool and then followed them to Pennsylvania Avenue where they distributed the crack. In addition, Padgett said that he witnessed Christopher and Anthony Neal trade crack for a motorcycle and a firearm. Padgett and law enforcement officers testified that they participated in several controlled drug purchases involving Christopher

Neal; and, on one occasion the purchase also involved Anthony Neal. Again, Vanetta Totten testified that she accompanied Christopher Neal and Anthony Neal on a trip to the Bahamas, where they went in search of cheaper cocaine sources.

c.

The government offered a substantial amount of independent evidence to show that Frederick Cargill was a member of the conspiracy. Christine Ness, Williamson, and Trooper Ragaukas all testified against him. Ness (Settle's girlfriend) testified that Cargill regularly accompanied Settle, Anthony Neal, and Christopher Neal on trips to New York City to obtain drugs. Trooper Ragaukas testified that he arrested Cargill on the New Jersey Turnpike along with Faircloth, an indicted coconspirator. The arrest ties Cargill to the conspiracy because he was found with crack while he was traveling from New York City with Faircloth. In addition, Williamson indicated that he regularly bought crack from several members of the conspiracy, including Cargill.

d.

Discounting the testimony of Settle, the government offered a substantial amount of evidence against Ronald Neal. Thomas Williamson testified that Ronald Neal was present on an occasion when Williamson saw Anthony and Thomas Neal cooking and preparing crack for distribution. Williamson also indicated that Ronald Neal's house at 709 Edwards Street served as a center for crack cocaine distribution. Williamson bought drugs from Ronald Neal and sold the drugs outside of 709 Edwards Street. Williamson brought Ronald Neal a five- to ten-dollar commission on each of his drug sales. Other evidence also tied Ronald Neal to the conspiracy. Monte Dean Padgett testified that he purchased crack cocaine from Christopher Neal at Ronald Neal's residence. On one occasion, Padgett and Christopher Neal drove to 709 Edwards Street where Christopher walked behind the house and returned to the car with over twenty-eight grams of crack. In addition, law enforcement officers testified about a raid that they conducted at Ronald Neal's 709 Edwards Street residence. When the police searched the house, they arrested Milton Faircloth, an indicted coconspirator, and found crack cocaine throughout the house, includ-

ing the den, the bathroom, the kitchen floor, a back room, and a bed-room. The police also recovered a police scanner, over $4,000 in cash, a .380 caliber handgun, a Tech Nine firearm, and scales. Thus, the combined testimony of Williamson, Padgett, and law enforcement connected Ronald Neal to the conspiracy and established that he was more than an individual drug pusher acting on his own.

### e.

Setting aside Settle's testimony, we conclude that it is clear beyond a reasonable doubt that a rational jury would have found the defendants guilty of the charged drug conspiracy and Christopher Neal guilty of the separate charges against him. Because there was no reasonable likelihood that the jury's verdict could have been different, we hold that the district court abused its discretion when it granted the defendants a new trial. This does not mean, however, that we condone in any way the government's conduct in dealing with Settle's testimony about his involvement with Johnson. We emphasize that we do not.

### III.

For the foregoing reasons, we reverse the district court's order granting a new trial to the defendants and remand to the district court with instructions to reinstate their convictions. This disposition of the government's appeal requires us to consider the merits of the defendants' appeal.

### IV.

Frederick Cargill makes two separate challenges to his conviction and sentence. First, he asserts that the district court erred in failing to grant his motion to suppress the crack cocaine that was recovered from him by a New Jersey State Trooper. Second, he asserts that the district court's application of a two-level sentence enhancement pursuant to *U.S. Sentencing Guidelines Manual* § 2D1.1(b)(1) was in error. We address these arguments in turn.

### A.

We review the denial of Cargill's suppression motion de novo. *See United States v. Ward*, 171 F.3d 188, 193 (4th Cir. 1999). As we have

previously recounted, New Jersey State Trooper Ragaukas stopped Milton Faircloth and Cargill as they were traveling from New York City to North Carolina on the New Jersey Turnpike. Ragaukas pulled the car over because Faircloth, who was driving, failed to maintain a safe lane in violation of N.J. Stat. Ann. § 39:4-88(b). Faircloth told Ragaukas that his license had been suspended and that Cargill was the owner of the car. Ragaukas ordered Faircloth out of the car and instructed him to sit on the guardrail. Ragaukas then began questioning Cargill, who was still sitting in the passenger's seat. Cargill furnished his license and registration and told Ragaukas that he and Faircloth were traveling from New York to North Carolina. According to Ragaukas, Cargill exhibited a nervous demeanor and was unresponsive to some of his questions. Based on Cargill's nervous and unresponsive behavior and the fact that no other troopers were in the area, Ragaukas ordered Cargill out of the car. As Cargill was getting out, Trooper Ragaukas observed a large bulge in Cargill's midsection. Cargill turned away from Ragaukas and tried to conceal the bulge. Upon seeing the bulge, Ragaukas was concerned that Cargill could be carrying a weapon. As a result, Ragaukas patted down Cargill's midsection. The Trooper felt a substance in Cargill's groin area, and based on his experience, he concluded that the substance was crack cocaine.

Cargill argues that Ragaukas did not have reasonable suspicion to order him out of the car, and therefore he was subjected to an unreasonable seizure under the Fourth Amendment. Cargill points out that nervousness and unresponsiveness alone cannot give rise to reasonable suspicion of criminal activity. *See United States v. Gooding*, 695 F.2d 78, 83-84 (4th Cir. 1982) (holding that defendant's "distraught" and "nervous" demeanor as he exited the plane did not constitute reasonable suspicion to justify investigative stop). Cargill's argument, however, is foreclosed by *Maryland v. Wilson*, 519 U.S. 408 (1997). In *Wilson* the Supreme Court held that a law enforcement officer may order passengers out of a vehicle pending the completion of a traffic stop regardless of whether the officer faces any special danger. *See id.* at 415. Thus, although Ragaukas did not have an articulable suspicion of danger at the time he ordered Cargill out of the car, his order did not run afoul of the Fourth Amendment.

## B.

Cargill also challenges the factual finding underlying the district court's application of a two-level sentence enhancement for possession of a dangerous weapon. We review this question for clear error. *See United States v. Rusher*, 966 F.2d 868, 880 (4th Cir. 1992). The district court enhanced Cargill's sentence under *U.S. Sentencing Guidelines Manual* § 2D1.1(b)(1), which provides for a two-level increase in the base offense level if "a dangerous weapon (including a firearm) was possessed" in the commission of a drug offense. A defendant's sentence may be enhanced pursuant to *U.S. Sentencing Guidelines Manual* § 2D1.1(b)(1) based on a coconspirator's possession of a dangerous weapon if the possession was in furtherance of the conspiracy and was reasonably foreseeable to the defendant. *See U.S. Sentencing Guidelines Manual* § 1B.3(a)(1).

The district court's application of the enhancement was based solely on its finding that Cargill was present at a meeting with Lee Marvin Settle, Kevin Jones, and Anthony Neal. Specifically, the court found:

> The Court will find as it found with the defendant Wilbert Anthony Neal that the defendant Fred Cargill was a part of the meeting discussing taking care of Cecilia Settle because of her contacting the police concerning drug activity in which the defendant was involved. The Court finds the evidence presented during the course of the trial established by a preponderance of the evidence that the defendant was — or the defendant could reasonably foresee that his involvement within the meeting and the activity could result in the type of injury [a severe gunshot wound to the head] to Cecilia Settle.

The district court's finding, that Cargill was present at the meeting, is clearly erroneous. The only witness who provided testimony about the meeting was Settle. Settle testified, however, that only Jones, Anthony Neal, and himself were present at the meeting. Because the two-level enhancement was based on a clearly erroneous finding of fact, we vacate Cargill's sentence and remand for him to be resentenced.

## V.

Anthony Neal challenges his conviction and sentence on three grounds. First, Neal claims that the government proved two conspiracies instead of the single conspiracy charged in the indictment. Second, he contends that the court erred by enhancing his sentencing guideline range four levels for being an organizer or leader pursuant to *U.S. Sentencing Guidelines Manual* § 3B1.1(a). Finally, Neal argues that the district court erred by enhancing his sentence two levels for possession of a dangerous weapon under *U.S. Sentencing Guidelines Manual* § 1B.3(a)(1).

## A.

We turn first to Anthony Neal's claim that the government's evidence showed two conspiracies and varied impermissibly from the indictment, which charged a single conspiracy. "In a conspiracy prosecution, a defendant may establish the existence of a material variance by showing that the indictment alleged a single conspiracy but that the government's proof at trial established the existence of multiple, separate conspiracies." *United States v. Kennedy*, 32 F.3d 876, 883 (4th Cir. 1994). Here, Anthony Neal argues that the government's introduction of evidence concerning his activities that led to his arrest in Louisville constituted a separate conspiracy. As noted previously, Anthony Neal, Christopher Neal, Vanetta Totten, and an anonymous supplier traveled to the Bahamas in search of a cheaper cocaine source. Upon returning from the Carribean without any cocaine, Totten, Anthony Neal, and the supplier went to New York and obtained two kilograms of cocaine powder. Anthony Neal claims that these events constituted a separate conspiracy for three reasons: (1) the purpose of the separate conspiracy was to obtain powder cocaine (as opposed to crack), (2) he intended to distribute the cocaine in Kentucky (as opposed to Reidsville, North Carolina), and (3) the operation in Kentucky involved different coconspirators.

The district court instructed the jury on multiple conspiracies, and Anthony Neal does not challenge the propriety of the instruction. Because the jury was properly instructed and found Neal guilty of a single conspiracy, the jury's finding "must stand unless the evidence, taken in the light most favorable to the government, would not allow

a reasonable jury so to find." *United States v. Lozano*, 839 F.2d 1020, 1023 (4th Cir. 1988). After viewing the evidence in the light most favorable to the government, we hold that a reasonable juror could have found that the government proved a single conspiracy. A juror could have concluded that the Kentucky operation was merely an extension of the North Carolina conspiracy and was part of an attempt to find new markets and sources for the Neals' drug business. In fact, several members of the conspiracy pooled money to fund the trip to the Bahamas and New York, and the cocaine was purchased in New York, where the conspirators regularly obtained wholesale quantities of cocaine. Although the North Carolina conspiracy's goal was to distribute crack, the conspiracy dealt extensively with cocaine powder, the necessary raw material for crack. Because a rational jury could have concluded that the Kentucky operation was a part of Anthony Neal's North Carolina conspiracy, the jury's single conspiracy finding should not be disturbed.

## B.

Anthony Neal next asserts that the district court erred by enhancing his sentence pursuant to *U.S. Sentencing Guidelines Manual* § 3B1.1(a) for being an organizer or leader of a criminal activity involving five or more participants. Neal's argument is essentially that he was not *the* leader of the organization. He points out that the conspiracy continued after he was arrested in Louisville. Before applying an enhancement under *U.S. Sentencing Guidelines Manual* § 3B1.1(a), a court should consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *U.S. Sentencing Guidelines Manual* § 3B1.1 cmt. n.4. Substantial evidence supports the district court's finding that Neal played a significant leadership role in the conspiracy. For example, testimony at trial indicated that Anthony Neal approved the shooting of Cecilia Settle, presided over the meetings of the conspirators, and recruited new members for the conspiracy. Thus, we conclude that the district court's enhancement was not in error.

## C.

Anthony Neal also challenges the district court's determination that he should receive a two-level sentence enhancement for possessing a dangerous weapon. A defendant's sentence may be enhanced pursuant to *U.S. Sentencing Guidelines Manual* § 2D1.1(b)(1) based on a coconspirator's possession of a dangerous weapon if the possession was in furtherance of the conspiracy and was reasonably foreseeable to the defendant. *See U.S. Sentencing Guidelines Manual* § 1B.3(a)(1).

The district court's application of the enhancement was based solely on the testimony of Lee Marvin Settle. Settle testified that he, Kevin Jones, and Anthony Neal met to discuss the planned murder of Cecilia Settle and that Anthony Neal essentially ordered Jones to "take care" of her. Based on Settle's testimony, the district court found "that Cecilia Settle was shot and wounded by a firearm at the direction of [Anthony Neal] and others at a meeting to discuss and decide what to do about her contacting the police."

The district court based this sentencing enhancement exclusively on Settle's testimony. After sentencing, however, the district court found (in a separate proceeding) that Settle had testified falsely at trial about his involvement in the Johnson conspiracy. At this stage, we cannot tell whether the district court would have credited Settle's testimony about the meeting to plan the murder of Cecilia Settle if the court had known that he lied about his involvement in the Johnson conspiracy. Accordingly, we vacate Anthony Neal's sentence because of the § 2D1.1(b)(1) enhancement, and we remand for the court to reconsider the issue and determine whether Settle's testimony regarding the meeting has "sufficient indicia of reliability to support its probable accuracy." *U.S. Sentencing Guidelines Manual* § 6A1.3(a).

## VI.

Christopher Neal also raises several challenges to his conviction and sentence. He argues that there was insufficient evidence to sustain his conviction, that the district court should have excluded the trial testimony of Daryl Simpson, and that the district court's drug calculations were in error.

A.

Christopher Neal claims first that there was insufficient evidence to convict him of conspiring to distribute drugs. We disagree. When reviewing a sufficiency of the evidence claim, we are bound to sustain the defendant's conviction "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942). As indicated in part II.D.3.d., several witnesses, including Monte Dean Padgett, testified that Neal was deeply involved in the conspiracy and agreed to its ends. We therefore conclude that there was substantial evidence to convict Christopher Neal of conspiracy.

B.

Christopher Neal also contends that there was insufficient evidence to convict him for carrying or using a firearm in relation to a drug trafficking offense under 18 U.S.C. § 924(c). Neal's claim, however, is without merit. Padgett testified that Neal received a gun in exchange for drugs. Section 924(c) proscribes this form of bartering. *See Bailey v. United States*, 516 U.S. 137, 143 (1995). We therefore affirm Christopher Neal's conviction under § 924(c).

C.

Christopher Neal next argues that there was insufficient evidence to prove that he employed a person under the age of eighteen to distribute cocaine in violation of 21 U.S.C. § 861(a)(1). Padgett testified that he, Neal, and a teenager (Gerald Jones) drove to a motel to buy guns and cocaine. Neal argues that the conviction is unsupportable because Jones testified that Neal was not involved in the transaction, and he claims that he did not know that Jones was under the age of eighteen. Viewing the evidence in the light most favorable to the government, we hold that substantial evidence supports Neal's conviction. Padgett testified that Neal instructed Jones to go inside the hotel and "not to take any less than a certain amount for the cocaine and to check the guns out real good." Although the testimony of Jones and Padgett conflict, the jury was entitled to credit Padgett's testimony and to reject Jones's. *See United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998) (holding that when a court evaluates the sufficiency

of the evidence, it does not review the credibility of the witnesses, and it assumes that the jury resolved all contradictions in the testimony in favor of the government). In addition, 21 U.S.C. § 861(a)(1) does not require that the defendant actually know that the individual he employed was under the age of eighteen. *See United States v. Cook*, 76 F.3d 596, 602 (4th Cir. 1996). Therefore, we conclude that substantial evidence supports Neal's conviction under § 861(a)(1).

## D.

Christopher Neal contends that the district court should have excluded the testimony of Daryl Simpson. Simpson was a known drug dealer who regularly trafficked in crack cocaine and testified that he purchased crack from Christopher Neal. Neal contends that Simpson did not have the expertise to testify that the substance Neal sold to him was actually crack and that expert scientific testimony was necessary to establish that fact. We review the admission of lay opinion testimony for an abuse of discretion. *See Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 110 (4th Cir. 1991). Lay opinion testimony is admissible if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701. Because Simpson was a known drug dealer who bought and sold crack for a living and his testimony was helpful to the jury's understanding, we cannot conclude that the district court abused its discretion in admitting the testimony. *See United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988).

## E.

Finally, Christopher Neal challenges the district court's calculation of his base offense level. The district court found that at least 1.5 kg of cocaine base was attributable to Neal, and therefore it determined that his applicable base offense level was 38 pursuant to *U.S. Sentencing Guidelines Manual* § 2D1.1. Neal claims that the district court erroneously held him responsible for more than 1.5 kg of cocaine. We review the district court's drug calculations for clear error. *See United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999). The record adequately supports the district court's quantity determinations. Several of Christopher Neal's coconspirators, including Frederick Cargill and

Milton Faircloth, were arrested with amounts of cocaine base that exceeded 1.5 kg. Because these amounts were "reasonably foreseeable to him within the scope of" the conspiracy, we hold that the district court's drug quantity findings are not clearly erroneous. *United States v. Irvin*, 2 F.3d 72, 77 (4th Cir. 1993).

## VII.

Ronald Neal claims that there was insufficient evidence to support his conspiracy conviction. As noted in part II.D.3.a., there was ample evidence to convict Neal. The testimony of Thomas Williamson and Monte Dean Padgett and the testimony about the police raid on 709 Edwards Street established that Ronald Neal was an active member of the conspiracy.

## VIII.

All of the defendants claim that their sentences violate *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Here, the indictment failed to allege drug quantity, and the issue of drug quantity was not submitted to the jury. At sentencing the district court determined that the defendants conspired to distribute more than fifty grams of crack cocaine and sentenced them under 21 U.S.C. § 841(b)(1)(A). In addition, the district court found that Christopher Neal distributed between five and fifty grams of crack cocaine and sentenced him under 21 U.S.C. § 841(b)(1)(B). The court also determined that he employed a person under eighteen years of age to distribute between five and fifty grams of cocaine base and sentenced him under 21 U.S.C. §§ 861(a)(1) and 841(b)(1)(B). Finally, Christopher Neal was due additional time for his firearms conviction under 18 U.S.C. § 924(c)(1). The defendants received sentences ranging from 292 months to life imprisonment as follows: Anthony Neal was sentenced to life in prison and five years of supervised release; Christopher Neal was sentenced to 300 months (with a 60-month consecutive term) and eight years of supervised release; Frederick Cargill was sentenced to 324 months and five years of supervised release; and Ronald Neal was sentenced to 292 months and five years of supervised release. The defendants argue that, in light of *Apprendi*, because drug quantity was not submitted to the jury and the indictment did not allege a specific quantity of crack cocaine, they could not be convicted and sentenced under §§ 841(b)(1)(A) or

(b)(1)(B). Instead, they contend that 21 U.S.C. § 841(b)(1)(C), which imposes a twenty-year maximum sentence for the distribution of any amount of crack cocaine, is the only section under which they could be sentenced. Because their sentences exceed § 841(b)(1)(C)'s twenty-year maximum, the defendants ask us to remand their cases for resentencing under § 841(b)(1)(C). Because the defendants did not raise their *Apprendi* argument in district court, our review is for plain error. *See United States v. Kinter*, 235 F.3d 192, 199 (4th Cir. 2000). To obtain relief under the plain error standard, the defendants must show that (1) there is an error, (2) the error is plain, (3) it affected their substantial rights, and (4) it seriously affected the fairness, integrity, or public reputation of the proceedings. *See United States v. Lipford*, 203 F.3d 259, 271 (4th Cir. 2000).

In *United States v. Promise*, No. 99-4737, 2001 WL 732389 (4th Cir. June 29, 2001) (en banc), we held that the failure to charge drug quantity in the indictment and to submit the quantity issue to the jury constitutes plain error and affects a defendant's substantial rights when the defendant's sentence for distributing a controlled substance exceeds the twenty-year statutory maximum set forth in 21 U.S.C. § 841(b)(1)(C). More recently, we held in *United States v. Cotton*, No. 99-4162(L), ___ F.3d ___, slip op. at 12 (4th Cir. Aug. 10, 2001), that the failure to charge drug quantity in the indictment "also seriously affects the fairness, integrity or public reputation of judicial proceedings." Thus, according to *Cotton*, the failure to charge drug quantity in the indictment constitutes "reversible plain error" whenever the district court imposes a sentence in excess of § 841(b)(1)(C)'s twenty-year maximum. *Cotton*, slip op. at 14.

We will deal first with Anthony Neal, Frederick Cargill, and Ronald Neal, each of whom received a sentence in excess of twenty years. Because drug quantity was not charged in the indictment, the district court committed plain error in sentencing these three defendants to more than twenty years, and this error affected their substantial rights. *See Promise*, 2001 WL 732389, at *8. Moreover, the error seriously affected the fairness, integrity, or public reputation of the proceedings. *See Cotton*, slip op. at 12. Accordingly, we vacate Anthony Neal's, Frederick Cargill's, and Ronald Neal's sentences and remand for resentencing with instructions that they be sentenced to a term of imprisonment not to exceed twenty years.

*Apprendi*, however, does not require us to vacate Christopher Neal's sentence. Christopher Neal was convicted on four separate counts. The district court sentenced him to a 300- month term of imprisonment and eight years of supervised release on the first three counts of the indictment, and it also imposed a sixty-month consecutive sentence on the fourth count for his violation of 18 U.S.C. § 924(c)(1). Because drug quantity was not charged in the indictment, the maximum penalties he could have received were 240 months on count one (21 U.S.C. §§ 846, 841(b)(1)(C)), 240 months on count two (21 U.S.C. § 841(b)(1)(C)), and 480 months on count three (21 U.S.C. §§ 861(a)(1), 841(b)(1)(C)). Christopher Neal's *Apprendi* claim ultimately fails because he cannot establish that the failure to charge drug quantity in the indictment affected his substantial rights, "i.e., that it 'actually affected the outcome of the proceedings.'" *Angle*, 2001 WL 732124 (quoting *United States v. Hastings*, 134 F.3d 235, 240 (4th Cir. 1998)). We have said that "[i]n the case of multiple counts of conviction, the sentencing guidelines instruct that if the total punishment mandated by the guidelines exceeds the statutory maximum of the most serious offense of conviction, the district court must impose consecutive terms of imprisonment to the extent necessary to achieve the total punishment." *Angle*, 2001 WL 732124 (citing *U.S. Sentencing Guidelines Manual* § 5G1.2(d)). Thus, notwithstanding any alleged *Apprendi* error, the Guidelines require Christopher Neal to serve partially consecutive sentences on the three counts for a total of 300 months. He has not demonstrated, therefore, that the error "affected the outcome of the proceedings." *Angle*, 2001 WL 732124 (quoting *Hastings*, 134 F.3d at 240). Because Christopher Neal has failed to establish that he is entitled to relief, we affirm his sentence.[2]

## IX.

In conclusion, we reverse the district court's order granting the defendants a new trial, affirm the sentence of Christopher Neal, and vacate the sentences of Frederick Cargill, Anthony Neal, and Ronald Neal. We remand for the district court to reinstate the judgments of conviction for all defendants, reinstate the sentence of Christopher

---

[2]The defendants also raise other arguments in their pro se supplemental briefs. We have considered each of these arguments and conclude that they are without merit.

Neal, and resentence Frederick Cargill, Anthony Neal, and Ronald Neal in accordance with our instructions.

*REVERSED IN PART, AFFIRMED IN PART,*
*VACATED IN PART, AND REMANDED*

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

As the majority relates, when the government used the perjured testimony, either knowingly or when it should have known of its falsity, the rule in *Giglio v. United States*, 405 U.S. 150, 154 (1972) should apply: "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)). In my opinion, the district court correctly noted that "[w]ithout Settle's testimony, the Government's case would not have been as overwhelming" and that "there was a 'reasonable likelihood that the jury could have reached a different verdict, if they had known . . . that Settle was giving false testimony,'" as quoted by the majority at slip 10.

In view of these findings and conclusions of the district court, with which I agree, I am of opinion that the granting of a new trial was not an abuse of discretion.

Since I would grant a new trial, I would not reach the other questions mentioned in the majority opinion and express no opinion as to them.