**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Jeff BOYD, et al., Defendants–Appellees.**

No. 95–1050.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1995.

Decided May 10, 1995.

Barry Rand Elden, Asst. U.S. Atty. and Patty Stemler (argued), Office of the U.S. Atty., Crim. Receiving, Appellate Division, Chicago, IL, for plaintiff-appellant.

Ronald J. Clark (argued), Michael J. Falconer, Joshua Sachs, Eugene O'Malley, Chicago, IL, Victor M. Pilolla, Oak Park, IL, Kenneth H. Hanson, Chicago, IL, and Noah Robinson, South Carolina Penal Institute, McCormick, SC, for defendants-appellees.

Before POSNER, Chief Judge, and CUMMINGS and KANNE, Circuit Judges.

POSNER, Chief Judge.

The United States appeals from an order by the district judge granting (with the immaterial exception of minor counts against two of the defendants) a motion for a new trial by criminal defendants. 833 F.Supp. 1277 (N.D.Ill.1993). (For collateral proceedings, see *United States v. Burnside,* 824 F.Supp. 1215 (N.D.Ill.1993) and *United States v. Andrews,* 824 F.Supp. 1273 (N.D.Ill. 1993).) Although interlocutory, such an order is appealable to us under 18 U.S.C. § 3731. The defendants, six leaders and one close associate of the "El Rukns," a notorious Chicago street gang formerly known as the "Blackstone Rangers" and the "Black P Stone Nation," were convicted by a jury after a four-month trial of a variety of very serious federal crimes. The judge sentenced five of the defendants to life in prison and the other two to fifty years. The evidence showed that during the 1980s the El Rukns had trafficked in heroin and cocaine on a large scale in the southern and western areas of the city and to protect their lucrative turf had committed many murders, attempted murders, kidnappings, and acts of intimidation. Their targets had included not only rivals in the drug trade but also potential witnesses.

The government's case depended heavily on the testimony of six former gang leaders, including Harry Evans and Henry Harris. The ground for the motion for a new trial was that the government had knowingly allowed Evans and Harris to perjure themselves at the trial and had withheld from the defense evidence that during the trial all six, who were being held at the Metropolitan Correctional Center (near the federal courthouse where the trial was held), had used illegal drugs and received unlawful favors from government prosecutors and their staffs. The district judge granted the motion for a new trial—in an opinion that occupies 90 pages of small print in the *Federal Supplement*—after he had taken testimony at a post-trial evidentiary hearing from 29 witnesses. The testimony convinced him that prosecutors and staff in the office of the U.S.

Attorney for the Northern District of Illinois had engaged in misconduct far more serious than anything involved in typical cases in which a prosecutor is accused of the knowing use of perjured testimony or of the violation of a defendant's right under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to be shown exculpatory evidence that is in the prosecution's possession. The government does not challenge the district judge's finding of gross prosecutorial misconduct, and we have no reason to suppose the finding flawed. But the Supreme Court has told us that we are not to reverse convictions in order to punish prosecutors. *United States v. Hasting,* 461 U.S. 499, 506–07, 103 S.Ct. 1974, 1979–80, 76 L.Ed.2d 96 (1983). Prosecutorial misconduct may precipitate a reversible error, but it is never in itself a reversible error. *United States v. Van Engel,* 15 F.3d 623, 631 (7th Cir.1993). In great tension with this principle, there are intimations that "outrageous governmental misconduct" is an independent ground for ordering a new trial in a federal criminal case; but we agree with the First Circuit that "the doctrine [of outrageous governmental misconduct] is moribund." *United States v. Santana,* 6 F.3d 1, 4 (1st Cir.1993). "Stillborn" might be a better term, for it never had any life; and it certainly has no support in the decisions of this court, which go out of their way to criticize the doctrine. *United States v. Okey,* 47 F.3d 238, 240 n. 2 (7th Cir.1995); *United States v. Nava–Salazar,* 30 F.3d 788, 800 (7th Cir.1994); *United States v. Cyprian,* 23 F.3d 1189, 1197 (7th Cir.1994); *United States v. Van Engel, supra,* 15 F.3d at 631–32; *United States v. Olson,* 978 F.2d 1472, 1481–82 (7th Cir.1992); *United States v. Miller,* 891 F.2d 1265, 1271–73 (7th Cir.1989) (concurring opinion). Today we let the other shoe drop, and hold that the doctrine does not exist in this circuit. The gravity of the prosecutors' misconduct is relevant only insofar as it may shed light on the materiality of the infringement of the defendants' rights; it may support, but it can never compel, an inference that the prosecutors resorted to improper tactics because they were justifiably fearful that without such tactics the defendants might be acquitted. *United States v. Dimas,* 3 F.3d 1015, 1020 (7th Cir.

1993) (per curiam); *United States v. Jackson*, 780 F.2d 1305, 1311 n. 4 (7th Cir.1986). If the prosecutors did not think their case airtight (and so they tried to bolster it improperly), this is some indication that it was indeed not airtight.

Although the government intimates that Judge Aspen's real motive for granting the motion for a new trial was to punish the U.S. Attorney's office for its misbehavior, there is no evidence of such a motive and we think it unlikely that, having just sat through a four-month trial and sentenced five of the defendants to life in prison and the other two to fifty years apiece, Judge Aspen would have been predisposed to grant a motion that might require him to sit through another four-month trial of the same defendants.

The government's 63–page opening brief barely mentions the standard of appellate review of the grant of a motion for a new trial in a criminal case. It argues that the district judge "abused his discretion," thereby tacitly acknowledging that the standard of review is deferential rather than plenary, but it makes no effort to maintain the distinction. It is content to argue that the judge erred.

We are not fetishistic about standards of appellate review. We acknowledge that there are more verbal formulas for the scope of appellate review (plenary or de novo, clearly erroneous, abuse of discretion, substantial evidence, arbitrary and capricious, some evidence, reasonable basis, presumed correct, and maybe others) than there are distinctions actually capable of being drawn in the practice of appellate review. *Morales v. Yeutter*, 952 F.2d 954, 957 (7th Cir.1991); *Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 916–17 (7th Cir.1991); cf. *United States v. Mazzanti*, 925 F.2d 1026, 1029 (7th Cir.1991); *Association of Data Processing Service Organizations, Inc. v. Board of Governors*, 745 F.2d 677, 683 (D.C.Cir.1984). But even if, as we have sometimes heretically suggested, there are operationally only two degrees of review, plenary (that is, no deference given to the tribunal being reviewed) and deferential, *Morales v. Yeutter, supra*, 952 F.2d at 957, *that* distinction at least is a feasible, intelligible, and important one. Yet apart from a parenthetical acknowledgment

that the standard of review of the grant of a motion for a new trial is abuse of discretion, the issue of the proper standard was ignored by the government until its reply brief, which acknowledged that appellate review of an order granting a new trial in a criminal case is indeed deferential—a concession that the government then evaded at the oral argument.

■ Appellate review of these orders is not deferential *tout court*. If the judge in the course of his analysis has occasion to resolve a pure issue of law, our review of that resolution is plenary. *United States v. Adebayo*, 985 F.2d 1333, 1341 (7th Cir.1993). But the other judgments that the district judge makes, signally here the judgment whether some piece (or pieces) of evidence wrongfully withheld by the government might if disclosed have changed the outcome of the trial, are to be reviewed deferentially. This is not only the rule; it is the dictate of common sense, especially in a case such as this. Forget the 29 witnesses at the evidentiary hearing; forget there *was* an evidentiary hearing on the motion for a new trial. Before then, during the trial, Judge Aspen had for months on end listened to witnesses—had heard, had not merely read, their testimony, and had watched them as they gave it. And he had observed the jurors as they listened to the witnesses. A trial judge of long experience, he would have developed a feel for the impact of the witnesses on the jury—and how that impact might have been different had the government played by the rules—that an appellate court, confined to reading the transcript, cannot duplicate. Judge Aspen may have been mistaken; we might suspect that he *was* mistaken; but unless we are *convinced* that he was mistaken, we have no warrant to reverse. That is what it means to say that appellate review is deferential. It is not abject, *Carr v. Allison Gas Turbine Division*, 32 F.3d 1007, 1008 (7th Cir.1994), but it is deferential.

■ Having cleared the underbrush, we consider first whether Judge Aspen committed clear error in finding that the government had made knowing use of perjured testimony at the trial. Witness Evans, jailed

in 1988 on numerous charges, had been held in the Metropolitan Correctional Center ever since. He thus was there throughout the trial of the defendants, which was held in 1991, except of course when he was testifying or meeting with prosecutors or prosecution staff in the courthouse or in the federal building across the street. Throughout the entire period Evans used illegal drugs and the prosecutors knew it. The question of his drug use came up at trial. He was asked by the prosecutor, "[Y]ou used and abused drugs from the seventies until the time you went to jail in 1988, isn't that correct?" "Yes, sir," replied Evans. The prosecutor then asked, "[H]ow many years would you say you have been using and abusing drugs?" Answer: "You just said it." "From '74 to '88, or earlier?" "That's a good figure." Judge Aspen interpreted Evans's last answer to mean that he had stopped using drugs in 1988. This is not an inevitable interpretation, but we cannot call it unreasonable; and so interpreted Evans's answer was a lie, and the government knew it. Whether the question was precise enough that Evans could actually be convicted of perjury may be doubted; but the wrong of knowing use by prosecutors of perjured testimony does not require a determination that the witness could have been successfully prosecuted. Successful prosecution would require proof beyond a reasonable doubt not only that the witness's testimony had been false but also that it had been knowingly false (and hence perjury). The wrong of knowing use by prosecutors of perjured testimony is different, and misnamed—it is knowing use of *false* testimony. It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false. *Hamric v. Bailey,* 386 F.2d 390, 394 (4th Cir.1967); Ronald L. Carlson, "False or Suppressed Evidence: Why a Need for the Prosecutorial Tie?" 1969 *Duke L.J.* 1171, 1186 n. 42; David Wolf, Note, "I Cannot Tell a Lie: The Standard for New Trial in False Testimony Cases," 83 *Mich. L.Rev.* 1925, 1926 n. 7, 1943 (1985); cf. *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972); *United States v. Anderson,* 574 F.2d 1347, 1355 (5th Cir.1978). We cannot find any recent cases

that enunciate this principle clearly, but it is implicit in the frequent use of "false" as a synonym for "perjured" in cases in which prosecutors are claimed to have knowingly used perjured testimony. E.g., *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *United States v. Adcox,* 19 F.3d 290, 295 (7th Cir. 1994); *United States v. Verser,* 916 F.2d 1268, 1271 (7th Cir.1990).

Shortly after the exchange that we just quoted, Evans said, "But I'm not on drugs now." We do not *know* whether he was high when he said this, so probably, again, he could not be successfully prosecuted for perjury. But given the context, Judge Aspen was entitled to infer that Evans would have been understood by the jury to have meant that he was no longer using drugs, which was false. Evans also answered "No" to the question, "You are not dealing drugs anymore?" The evidence is that he was. He was heard to admit this in a phone conversation a year later, while before the trial he not only had been using drugs but had had in his possession large, unexplained quantities of cash. The suspicious circumstances bracketed the trial and there was no basis for supposing that he had behaved himself during the trial. The government knew all this. Judge Aspen was entitled to infer that Evans had lied when he testified that he was not dealing in drugs any more, and that the government had known that he had lied.

■ The knowing use of perjured testimony is not an automatic ground for a new trial. There must be some likelihood that it made a difference. *Giglio v. United States, supra,* 405 U.S. at 154, 92 S.Ct. at 766; *United States v. Agurs, supra,* 427 U.S. at 103, 96 S.Ct. at 2397; *United States v. Douglas,* 874 F.2d 1145, 1161 (7th Cir.1989). But of course the impact of the testimony need not be considered apart from the impact of other improprieties committed by the government. So we consider the other improprieties first, and return to the issue of impact, of "prejudice," later.

■ The other improprieties are the alleged violations of the *Brady* rule. The prisoner witnesses, not only Harris and Evans

but the four other ex-El Rukns, received a continuous stream of unlawful, indeed scandalous, favors from staff at the U.S. Attorney's office while jailed at the MCC awaiting the trial of the defendants. Disclosure of these benefits, of course known to the prosecution (the *source* of the benefits), would have helped the defendants by undermining the credibility of key witnesses against them. The rule of *Brady* applies to evidence usable only to impeach the credibility of the prosecution's witnesses, and not just to direct evidence of innocence. *United States v. Bagley*, 473 U.S. 667, 676–77, 105 S.Ct. 3375, 3380–81, 87 L.Ed.2d 481 (1985); *Giglio v. United States, supra*, 405 U.S. at 154, 92 S.Ct. at 766; *United States v. Douglas, supra*, 874 F.2d at 1163. This means that, quite apart from either the favors or the perjured testimony, the fact, known to the government, that the witnesses were using drugs throughout the period of the trial and its preparation should have been disclosed to the defendants because it was a fact they could have used to challenge the witnesses' credibility.

The favors must not be ignored, however. In the MCC itself, visitors are forbidden to make physical contact with prisoners; the primary fear is that the visitors will pass drugs to the prisoners. Bizarrely, the prosecutors permitted the prisoner witnesses—hardened and dangerous criminals all—to entertain their visitors in the U.S. Attorney's office in the federal courthouse and in the office of the Bureau of Alcohol, Tobacco, and Firearms in the federal building across the street from the courthouse. Security for these visits was so lax that the visitors, almost always women, were able not only to pass drugs to the witnesses but also to have sexual intercourse with them. Evans's most frequent visitor was a woman politely described as his "common law wife" (there is no common law marriage in Illinois). Evans had been caught having sex with her in the MCC and had been disciplined for this violation of the MCC's rules, as the prosecutors well knew. The prosecutors nevertheless allowed her to visit him in the government offices in circumstances in which a repetition of his offense was certain. Evans's "common law wife" also appears to have been the principal source of the drugs that he ob-

tained and used—and sold—throughout the period of the trial. The government, while not aware of the details of these visits, was well aware of the opportunity that the visits afforded for shenanigans involving sex and drugs. It also knew that the witnesses used their opportunity to roam about in government·offices unsupervised to steal numerous documents (some highly confidential), later found back in the MCC whither they had carried them.

The prosecutors also gave the witnesses unlimited and unsupervised telephone privileges available to no other federal prisoners. Members of the prosecution team would routinely accept collect calls from the witnesses at the MCC and then at the witness's request would forward the calls to outside numbers. The telephoning was incessant, reaching a point at which two of the prosecutors complained to the head of the prosecution team about the cost to the government. Some witnesses, on their visits to the office of the Bureau of Alcohol, Tobacco, and Firearms, were permitted to answer the phones in the office, and they would often answer "ATF." Some of the calls they answered were from other inmates, and they would forward these calls to outside numbers at the request of the caller. The witnesses also used their phone privileges to order drugs. On occasion the witnesses drank beer in the government offices, although it is unclear whether the prosecutors knew. about this.

A government paralegal named Luchetta, a member of the prosecution team, developed personal relationships with the prisoner witnesses. These relationships involved phone sex and assistance in smuggling contraband into the MCC. Luchetta gave witness Harris a number of presents: a U.S. flag, a thesaurus, two maps of the world, one emphasis pointer, two pairs of pants, two shirts, one sweatshirt, and a pair of gym shoes. In addition she threw two birthday parties for him. Harris and other witnesses received presents from other members of the prosecution team as well. The head of the team, Hogan, developed a personal relationship with Harris. Hogan accepted gifts from Harris, who in turn made Hogan a legatee in his will. Harris took a fancy to a female

paralegal (not Luchetta), and apparently told Hogan about this, for Hogan approached the paralegal's supervisor and asked her whether the paralegal would accept phone calls from Harris. (The supervisor replied, "Absolutely not.")

The government did not disclose any of these goings-on to the defendants. A few of the shenanigans, it is true, such as the naming of Hogan in Harris's will, occurred after the trial and strictly, therefore, were relevant only to a motion for a new trial on the basis of newly discovered evidence, which is not before us. *United States v. Veras,* 51 F.3d 1365, 1375 (7th Cir.1995). Judge Aspen knew this, but remarked, properly we think, that even the later-occurring events gave an insight into the character of the relationship between the prosecutorial team and the prisoner witnesses. The events in question occurred shortly after trial and were obviously the culmination of an unprofessionally, indeed scandalously, close relationship between prosecutors and criminals that had started before the trial and had continued through it.

█ The difficult question is that of the impact on the trial's outcome of the perjured testimony and of the prosecution's failure, in violation of *Brady,* to reveal to the defense either the drug use and drug dealing by prisoner witnesses *during* the trial or the favors (other than those that occurred after the trial was over) with which the prosecution had showered those witnesses. We agree with the government that a unitary standard guides our inquiry into the prejudicial impact of all the alleged improprieties, and that it is whether there is a reasonable probability that, had it not been for the improprieties, the defendants would have been acquitted. *United States v. Bagley, supra,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985); *id.* at 685, 105 S.Ct. at 3385 (concurring opinion). (Any doubt that this is the proper standard has been dispelled by *Kyles v. Whitley,* —— U.S. ——, —— - ——, 115 S.Ct. 1555, 1564–67, 131 L.Ed.2d 490 (1995), decided by the Supreme Court after the argument in this case.) But the precise question for us is not whether *we* think the combination of perjured testimony and concealing exculpatory

evidence is likely to have affected the outcome of the trial but whether we are convinced that Judge Aspen's answer to the question was wrong. As the perjured testimony and the concealed evidence went only to the credibility of the prisoner witnesses, the question of prejudicial impact can be further decomposed into two questions: Is there some reasonable probability that the jury would have acquitted the defendants on at least some of the counts against them had the jury disbelieved the essential testimony of these witnesses? And might the jury have disbelieved that testimony if the witnesses hadn't perjured themselves about their continued use of drugs and (or) if the government had revealed to the defense the witnesses' continued use of drugs and the favors that the prosecution had extended to them?

The answer to the first question is clearly "yes." Although the testimony of the six prisoner witnesses for the prosecution was corroborated, had their testimony been disbelieved the defendants would have had to be acquitted on most counts. It is true that the government introduced a number of taped conversations that were highly incriminating of the defendants, but these tapes were translated by witness Harris and their meaning was thus conveyed to the jury through his testimony. If the jury hadn't believed him, it would not have been impressed by the tapes. And without the tapes, the testimony of the prisoner witnesses was essential on most of the counts of which the defendants were convicted.

So the case comes down to whether Judge Aspen abused his discretion in finding that there was a reasonable probability that the jury would have disbelieved the essential testimony of the prisoner witnesses had the defendants been able to impeach them without the impediments created by the government's improprieties. The government argues that the witnesses had already been so thoroughly impeached that additional impeachment could have made no difference. *United States v. Derr,* 990 F.2d 1330, 1336 (D.C.Cir.1993). The witnesses were cross-examined extensively about their criminal activities while they were members of the El Rukns. These activities covered the full

gamut of the El Rukns' crimes and thus included drug trafficking and murder, not to mention the intimidation of witnesses. The jury could not have doubted that the witnesses would lie if they thought it in their interest and that their only hope of avoiding life imprisonment or, in the case of one witness, capital punishment lay with the prosecution. The argument is that if the jury believed that such scoundrels notwithstanding such pressures were telling the truth, additional impeachment could not have shaken that belief. Merely cumulative evidence is excludable, as having little probative value, Fed.R.Evid. 403; merely cumulative impeachment evidence likewise. And obviously it need not be inadmissible in order to lack sufficient weight to require new trial on the ground that its exclusion was a prejudicial error; not all admissible evidence is strongly probative of the proposition for which it is introduced.

If the evidence that was not revealed had consisted of one more crime, or for that matter ten more crimes, committed by each of the witnesses when he was an El Rukn, we have no doubt that Judge Aspen would have denied the motion for a new trial; for extending the list of past crimes would not have made a difference to the jury's evaluation of the witnesses' credibility. The reason the concealed evidence might well have made a difference was that the witnesses had claimed to have "seen the light" when, having been arrested and sentenced or threatened with severe punishment for their activities as El Rukns, they had decided to cooperate with the government. That had been in 1985. Six years later they were still dealing drugs, stealing, smuggling, violating jail rules, and lying on the stand. Had these things been known to the jury it might have doubted their testimony that they had "seen the light." Knowing that they were lying under oath about their using and dealing in drugs, the jury might reasonably have supposed that they were lying about the criminal activities of the defendants as well. And this is not all. Had the jury known that the prisoner witnesses were receiving favors, including sexual favors, the equivalent of a free telephone credit card, and illegal drugs, all with the permission or connivance of the U.S.

Attorney's office, the jury might have wondered whether the witnesses were not receiving implicit assurances of compensation for their testimony going far beyond anything promised in their plea agreements, the terms of which had been revealed to the jury. If a prisoner is treated by officers of the United States Government as if he had the sexual and other privileges of a free man, treated indeed as a *friend* (even as a potential lover), may it not occur to him that if he plays ball with his powerful friend the friend will not just get his death sentence reduced to natural life or his natural-life sentence reduced to thirty years but will somehow arrange to restore his freedom to him in the near future? Do you throw a birthday party for a man who you think deserves to spend his life behind bars? Might not a reasonable jury have concluded, had they known all the facts, that the prosecution team must have had *desperate* doubts about the testimonial reliability of these witnesses to have lavished such extraordinary personal attentions upon them? In short, might not the prosecution's case have collapsed *entirely* had the truth come out about the behavior and the treatment of these witnesses?

We do not know, of course. An alternative hypothesis is that the witnesses were simply very good bargainers, who obtained more consideration from the prosecution in exchange for their testimony than most witnesses do. The issue is judgmental. The responsibility for the exercise of the requisite judgment is the district judge's and we are to intervene only if strongly convinced that he judged wrong. We are not strongly convinced. The grant of the new trial must therefore stand.

AFFIRMED.