WOOD, Circuit Judge,
dissenting.
My colleagues have concluded that the district court erred when it refused to grant a preliminary injunction requiring Southern Illinois University School of Law (SIU) in Carbondale to recognize a local chapter of the Christian Legal Society (CLS) as an official student organization. That conclusion is possible, however, only by asking the wrong questions, and.thus arriving at the wrong answers. The problem . is compounded by the state of the record, which the majority acknowledges is “spartan,” ante at 867. I would dissolve the temporary injunction that this court issued pending appeal and allow SIU to enforce its nondiscrimination policy while the case- proceeds through a full exploration of the merits.
*868 If, in the end, the facts show that the nondiscrimination policy does not apply to student organizations, or that SIU is discriminating against CLS based upon its evangelical Christian viewpoint, the district court should certainly enjoin SIU from enforcing its policy. If on the other hand SIU, as it claims, is merely applying its Affirmative Action/Equal Employment Opportunity Policy (AA/EEO) to an “education opportunity” in a neutral and evenhanded manner to religious and nonreligious groups alike, and it is not taking any actions that “force” CLS to accept members with views that do not comport with CLS’s interpretations of the Bible, then SIU is entitled to prevail.
At the outset, it is important to review what is in this record and what is not. With the facts (established and not) in mind, I then turn to the standard of review that this court ought to be applying. Finally, I discuss the important differences between the present case and Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) — differences that have a dispositive effect on the way in which the First Amendment rights that CLS is asserting intersect with SIU’s own constitutional rights and obligations.
I
The record contains only a brief description of CLS, other student organizations, and the way that SIU interacts with them. We know only that there is an organization called CLS at SIU; that it is a local chapter of an organization called the Christian Legal Society; that it was a registered student organization at SIU’s Law School until March 25, 2005; and that registered student organization status carried with it privileges such as access to space on Law School bulletin boards, private meeting space within the Law School, storage space within the Law School, access to the Law School’s website and publications, email access on the Law School’s List-Serve, eligibility for certain funding through the Law School, and use of the SIU name. The record also includes the following statement made by CLS:
CLS interprets its Statement of Faith to require that officers and members adhere to orthodox Christian beliefs, including the Bible’s prohibition of sexual conduct between persons of the same sex. A person who engages in homosexual conduct or adheres to the viewpoint that homosexual conduct is not sinful would not be permitted to serve as a CLS chapter officer or member. A person who may have engaged in homosexual conduct in the past but has repented of that conduct, or who has homosexual inclinations but does not engage in or affirm homosexual conduct, would not be prevented from serving as an officer or member.
Fairly read, this statement reveals that CLS would prevent a person who openly affirmed his or her right to engage in homosexual conduct, as part of an intimate relationship with another person, from serving as an officer or member of the organization. Furthermore, Article IV, Section 4.1, of the CLS chapter constitution provides:
Equal Opportunity and Equal Access. In the conduct of all aspects of its activities, the Chapter shall not discriminate on the basis of age, disability, color, national origin, race, sex or veteran status.
Conspicuous by its absence from this list is sexual orientation. The constitution at Section 4.2 also provides that membership “shall be open to all students at the School who agree with the mission and purposes ... [and] who sign, affirm, and endeavor to live their lives in a manner consistent with the Statement of Faith.”
Finally, the record reveals that the Dean of the Law School, Peter C. Alexander, *869 informed CLS that it was in violation of the policy of SIU-Carbondale “to provide equal employment and education opportunities for all qualified persons without regard to race, color, religion, sex, national origin, age, disability, status as a disabled veteran or a veteran of the Vietnam era, sexual orientation, or marital status.” (This policy is referred to in the record as the Affirmative Action/Equal Employment Opportunity Policy. While the majority criticizes SIU for failing to state specifically what policy CLS violated, Dean Alexander’s letter to CLS makes clear by quoting it that the policy in question is the Affirmative Action/Equal Employment Opportunity Policy. I address this policy in more detail below.) Dean Alexander also said that recognized student organizations must adhere to “all appropriate federal or state laws concerning nondiscrimination and equal opportunity.”
Because of the procedural posture of this case, including the fact that SIU has not yet submitted any evidence, many critical questions remain unexplored. Indeed, some of the supplemental filings this court has received underscore how important these unresolved facts may be. For example, the Center for Law and Religious Freedom, which represents CLS, argues in a letter filed pursuant to Federal Rule of Appellate Procedure 28(j) that CLS does not discriminate “on the basis of ‘sexual orientation’ ” when it insists that its members refrain from “unrepentant sexual conduct outside of traditional marriage,” whether that conduct be homosexual or heterosexual. Argument by counsel in a supplemental letter, or even in a brief, is a poor substitute indeed for facts on the ground. When the time comes for permanent relief, solid answers to the following questions, among others, will be essential:
1.How has CLS’s policy been applied in the past to students who failed to live up to its Biblically-based code of conduct (whether sexually or otherwise)? Has it banned from membership, for example, heterosexual students who have had sexual relations outside marriage? Has it actually admitted any gays who choose not to be sexually active?
2. How has the SIU-Carbondale AA/ EEO policy been applied in the past? When, if ever, has it been applied to student organizations, as opposed to employees of the University or in classroom situations?
3. Does the evidence show that the SIU-Carbondale AA/EEO policy, which the district court found was facially neutral, has been applied neutrally? How are investigations of violations of the policy initiated?
4. What are the membership and leadership requirements for other recognized student organizations, including the Muslim Students’ Association, the Adventist Campus Ministries, the Chi Alpha Christian Fellowship, the Young Women’s Coalition, the Republicans, the Democrats, and the Lesbian and Gay Law Students and Supporters? Does SIU vet student organizations’ constitutions to see if their membership policies are compliant with the AA/EEO policy?
5. Have any other student organizations been denied recognition? If so, under what circumstances? If not, then what justification does SIU-Carbondale have for starting with CLS?
If it turns out that CLS is the only student organization that both (a) espouses views that are inconsistent with the AA/EEO policy and (b) has been denied recognition as a student organization, then there would be reason to fear unlawful discrimination. See Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). If, on the other hand, the other organizations have accommodated their rules and trusted to individual preference to attract the desired *870 participants, we would have a different case. It is virtually impossible to evaluate the Law School’s action with respect to CLS without knowing whether it conforms or not to the treatment of similar organizations. CLS has made extensive allegations about these other organizations in its moving papers, but it gives us no reason to think that it has direct knowledge of the internal policies of those organizations. CLS has also included a smattering of constitutions from other groups, but no one from those groups has testified about the accuracy of those documents, nor do we have anything that would tell us anything about the interpretation or application of those constitutions.
II
The question remains whether CLS is entitled to a preliminary injunction restoring its status as a recognized student organization, pending a more complete investigation of these issues. In order to answer that question, we must consider both the standard the district court was obliged to follow in evaluating CLS’s request for a preliminary injunction and the standard of review that this court applies on appeal. In Goodman v. Illinois Department of Financial and Professional Regulation, 430 F.3d 432 (7th Cir.2005), a case in which a chiropractor brought a First Amendment challenge against a state rule that prohibited telemarketing of professional medical services, this court had the following to say about the two relevant standards:
As the Supreme Court has observed, “[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.” Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice And Procedure § 2948, pp. 129-30 (2d ed.1995)). To justify this relief, movants must show that (1) they have a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. Joelner v. Vill. of Washington Park, 378 F.3d 613, 620 (7th Cir.2004) (citing Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1607[sic] (7th Cir.1994)). A district court’s denial of a preliminary injunction is reviewed for abuse of discretion. Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 664, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) [ (citations omitted) ].
430 F.3d at 437.
The majority acknowledges this well-established law briefly, ante at 859, but, citing Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), it moves quickly to the observation that the reviewing court must make an independent review of the record in cases involving allegations of harm to interests protected by the First Amendment. As Hurley makes clear, however, the independent review of which the Court was speaking has to do with the ascertainment of the underlying facts, not the broader standard of review. See id. at 567, 115 S.Ct. 2338. For example, the reviewing court does not give the normal deference to matters of witness credibility, nor does the usual “clearly erroneous” standard of review cabin the examination of the facts. Id. Thus, in Hurley, where the parties disagreed whether a parade had the element of expression necessary to implicate the First Amendment, the Court decided this issue for itself. This does not mean that the Court abandoned the abuse of discretion *871 standard of review for appellate courts in cases involving First Amendment rights. If there was any doubt about that, the Court put it to rest in Ashcroft v. American Civil Liberties Union, which involved a First Amendment challenge to a statute designed to protect minors from exposure to sexually explicit materials on the internet. 542 U.S. at 659-60, 124 S.Ct. 2783. Reviewing a decision by the lower courts to enjoin that statute because it probably violated the First Amendment, the Court wrote:
This Court, like other appellate courts, has always applied the abuse of discretion standard on review of a preliminary injunction. The grant of appellate jurisdiction under [28 U.S.C.] § 1252 does not give the Court license to depart from established standards of appellate review. If the underlying constitutional question is close, therefore, we should uphold the injunction and remand for trial on the merits. Applying this mode of inquiry, we agree with the Court of Appeals that the District Court did not abuse its discretion in entering the preliminary injunction.
Id. at 664-65, 124 S.Ct. 2783 (internal quotations and citations omitted).
It is important to note that the existence of a close question logically implies that the district court does not abuse its discretion when it chooses one result over another. A pair of cases in this court in which an alarming pattern of prosecutorial misconduct emerged in criminal trials of high-level drug dealers affiliated with the notorious El Rukn gang illustrates this point well. In United States v. Boyd, 55 F.3d 239 (7th Cir.1995), the district court judge had decided that some of the defendants were entitled to a new trial; applying the abuse of discretion standard to that decision, this court affirmed. See id. at 246 (“The issue is judgmental. The responsibility for the exercise of the requisite judgment is the district judge’s and we are to intervene only if strongly convinced that he judged wrong. We are not strongly convinced.”). Later, in United States v. Williams, 81 F.3d 1434 (7th Cir.1996), another district court judge responsible for a different group of defendants concluded that no new trial was necessary. Once again, this court affirmed, with the following comments:
Another point that is difficult for non-lawyers to understand or accept is that because the question whether to grant a new trial is committed to the discretion of the district judge, as the defendants rightly concede, it is possible for, two judges, confronted with the identical record, to come to opposite conclusions and for the appellate court to affirm both. That possibility is implicit in the concept of a discretionary judgment. If the judge could decide only one way he would not be able lawfully to exercise discretion; either he would be following a rule, or the circumstances would be so one-sided that deciding the other way would be an abuse of discretion. If the judge can decide either way because he is within the zone in which he has discretion — can decide either for or against the grant of a new trial — this implies that two judges faced with the identical record could come to opposite conclusions yet both be affirmed.
When we affirmed Judge (now Chief Judge) Aspen’s grant of a new trial to the defendants in the Boyd case, we went out of ur way to make clear that we were affirming not because we thought he necessarily was right but because we thought he was reasonable, that he had not “abused his discretion.” Because we found no abuse of discretion in his having granted a new trial we had no occasion to decide whether we would also have affirmed him had he denied a new trial or whether, on the contrary, it was one of those one-sided cases where *872 only one ruling is possible. So the fact that Judge Mills on a record very similar, though ... not identical, to that before Judge Aspen made the opposite ruling does not necessarily require, as a matter of maintaining consistency with our decision in Boyd, that we reverse Judge Mills.
Id. at 1437-38 (internal citations omitted). Bearing this in mind, the Supreme Court’s decision to affirm the issuance of the preliminary injunction in Ashcroft v. ACLU in no way suggests that the Court would have reversed had the district court come to the opposite conclusion. The closer the question, the more room there is for the exercise of thoughtful discretion.
Ill
With the facts, such as they are, and these standards in mind, all that remains is to consider whether the district court’s decision to deny the injunction that CLS requested was an abuse of discretion. The principal reasons why the majority believes that the answer to this question is yes are its conclusions that irreparable harm to CLS must be presumed, that money damages will be inadequate, and that an injunction automatically would be in the public interest. Ante at 859.1 do not take issue with those propositions in the abstract. Nevertheless, litigants must show more than these points before they are entitled to a preliminary injunction. Specifically, they must demonstrate two more elements: (1) likelihood of success on the merits, and (2) the irreparable harm that the proponent of the injunction will suffer without it outweighs the irreparable harm the opponent of the injunction will suffer with it. In my view, CLS has not satisfied these burdens at this early stage. I take the two points in turn.
A. Likelihood of Success on the Merits
The majority offers three reasons for its conclusion that CLS is likely to succeed on the merits: first, that CLS may not have violated any SIU policy; second, that SIU may have infringed impermissibly on CLS’s right of expressive association; and third, that SIU violated CLS’s free speech rights by ejecting it from a speech forum in which it had a right to remain. Ante at 859-60. The record as it now stands, even interpreted independently, fails to support any of those assertions.
The policy that applies to SIU’s action is the AA/EEO policy, which promises that SIU will “provide equal employment and education opportunities for all qualified persons without regard to ... sexual orientation.” Recognized student organizations play an integral role in the educational process offered by universities, as the Supreme Court recognized in Board of Regents of University of Wisconsin System v. Southworth, 529 U.S. 217, 222-23, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) (noting that “[i]n the University’s view, the activity fees ‘enhance the educational experience’ of its students by ‘promot[ing] extracurricular activities,’ ‘stimulating advocacy and debate on diverse points of view,’ enabling ‘participation] in political activity,’ ‘promoting] student participation] in campus administrative activity,’ and providing ‘opportunities to develop social skills,’ all consistent with the University’s mission”). The Court there held that “[t]he University may determine that its mission is well served if students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside the lecture hall.” Id. at 233, 120 S.Ct. 1346. Rosenberger also involved the extracurricular part of the university experience. 515 U.S. at 824, 115 S.Ct. 2510 (noting that “the purpose of the [Student Activities Fund] is to support a broad range of extracurricular student activities that ‘are related to the educational purpose of the University’ ”). SIU was *873 therefore on well-trodden ground when it notified CLS that its AA/EEO policy applied to student organizations that sought official recognition because such recognized student groups provide educational opportunities. Given that SIU’s purpose in recognizing student organizations is to provide educational opportunities for its law students, it follows that any recognized organization must follow the rules for the school’s “education opportunities.” If such an organization (here CLS) discriminates on any basis forbidden by the policy, it is subject to corrective measures. This is enough, in my view, to tip the balance on “likelihood of success on the merits” to SIU’s side.
The majority attempts to avoid this conclusion by drawing a distinction between discrimination on the basis of sexual orientation and discrimination on the basis of sexual conduct. The record contains absolutely no evidence, however, either supporting or refuting the notion that CLS actively bans from membership or leadership positions heterosexual students who may be sexually active outside the boundaries of marriage. Likewise, the record is thoroughly devoid of evidence indicating that a gay or lesbian who has chosen not to be sexually active has been permitted to be a member or leader of CLS. Furthermore, in light of the Supreme Court’s recognition in Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), that adult, homosexual, individuals “are entitled to respect for their private lives,” that the “State cannot demean their existence or control their destiny by making their private sexual conduct a crime,” and that “[tjheir right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government,” id. at 578, 123 S.Ct. 2472, it seems unlikely that a State that wishes to ban both forms of discrimination is forbidden from making this choice. (This is not to say that the State is required to take this step; the military, for example, has not yet done so, and the Supreme Court’s decision in Rumsfeld v. Forum for Academic and Institutional Rights, Inc., — U.S.-, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (FAIR), indicates that its policy is permissible too.)
Next, the majority worries that SIU’s policy infringes on CLS’s right of expressive association. But, unlike the rule at issue in Boy Scouts of America v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), SIU has in no way tried to compel CLS to admit members or to elect officers that offend its precepts. It has said only that CLS must content itself with the benefits and support given to non-recognized student organizations, rather than also receiving the additional perks that go along with recognized status. The Supreme Court has often drawn a line between rules that compel conduct and rules that merely withhold benefits. In the area of abortion, for example, Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality), reaffirms the “central holding” of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), forbidding the states from banning abortion outright, but as early as 1977, the Court recognized in Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), that the State was under no obligation to provide affirmative financial support to indigent women who sought abortions. It did so even as it reaffirmed the woman’s fundamental right to choose whether or not to terminate her pregnancy. See id. at 475, 97 S.Ct. 2376 (“There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.”). The same principle applies here: SIU has left CLS entirely free to adopt whatever policies it wants; it has simply declined to *874 give certain additional assistance (financial and in-kind) to organizations that violate its nondiscrimination policy. Nothing SIU has done infringes on CLS’s freedom of expressive association, and so this theory cannot support a finding that CLS is likely to succeed on the merits.
In finding otherwise, the majority relies heavily on the Supreme Court’s decision in Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266. But a closer look at Healy shows instead why SIU’s approach to CLS is permissible. In Healy, certain students wanted to establish a chapter of the Students for a Democratic Society (SDS), which in the late 1960s and early 1970s was a self-styled “radical” campus group. Central Connecticut State College decided that it did not want SDS anywhere near it. It thus not only refused to confer “recognized” status on the aspiring SDS chapter, it also refused to allow the SDS group to meet on campus, or to make announcements about meetings and rallies through college newspapers and bulletin boards. Still not satisfied, it took the rather extraordinary step of refusing to let the SDS students meet (ie. sit together) in the campus coffee shop! Id. at 181, 92 S.Ct. 2338. SIU’s actions were nothing like this. SIU permitted CLS to have free access to the law school’s classrooms for its meetings; it never banned CLS from campus coffee shops or other facilities. Although CLS would need to pay a fee to use the auditorium, its activities as a practical matter were unaffected by that rule, as CLS was a tiny group of six to 12 students. The record says nothing about avenues such as fee waivers or admission charges that might have been available if CLS had wanted to sponsor a large program of general interest to the SIU community. Moreover, the importance that physical campus bulletin boards have today is nothing like the situation in 1972. Most universities and colleges, and most college-aged students, communicate through email, websites, and hosts like MySpace®. Again, although SIU might not have facilitated CLS’s efforts to set up a website and to send emails to other potentially interested students, it did nothing to prohibit CLS from taking advantage of electronic access methods. (If CLS had its own website, any student at the school with access to Google — that is, all of them — could easily have found it.) Healy, in short, offers an example of real exclusion from campus; our case presents a counterexample of neutrality toward organizations that do not have formal recognition, but that are otherwise welcome to operate on their own.
Finally, the majority accepts CLS’s argument that the University violated its free speech rights by ejecting it from a nonpublic forum without a compelling interest. The majority concedes that the record does not contain enough information to make a definitive decision on the nature of the forum. It suggests that the record contains evidence that SIU has applied its AA/EEO policy in a discriminatory way, ante at 866, but the bare texts of a few other alleged constitutions, unverified and without context, are too weak a reed on which to rely. Not a single person from the Muslim Students’ Association, or the Adventist Campus Ministries, or the Young Women’s Coalition testified, or even provided an affidavit, and so we have no way of knowing whether those organizations were actively discriminating on a prohibited basis. Such evidence, in my view, is critical to the outcome of this case. I agree with the majority that if SIU has somehow singled out CLS for adverse treatment, while tolerating discriminatory practices in violation of its policy for other similarly situated organizations, its position is far more tenuous. The record at this point, however, gives us no reason to think that the University is behaving in such a foolish manner, and I am unwilling to indulge in the presumption that a body *875 that is legally part of the State of Illinois is violating the federal and state constitutions.
B. Balancing of Harms
The last point relates to the balancing of harms between whatever detriments CLS will suffer if it is denied recognition pending the outcome of this case and the injury that SIU will suffer if it is forced to recognize CLS. CLS undoubtedly has a strong interest in its associational freedom, but, as I have already noted, nothing that SIU is doing directly impedes that freedom, and the indirect effects of SIU’s policies are mild. That alone distinguishes this case from Dale and Healy. Another important difference between our case and Dale stems from the fact that CLS is trying to force an affiliation between itself and a state institution. Dale was about the prerogative of a private institution to set standards for members and leaders. Here, the State of Illinois, through its universities, has a strong countervailing interest — indeed, in many instances, a compelling constitutional duty — in giving equal treatment to all of its citizens. If CLS wanted to forbid membership to all African-Americans, or to mixed-race wedded couples, or to persons of Arabic heritage, surely SIU would be entitled at a minimum to say that such an organization would have to sustain itself without any state support— even if it could root such a membership policy in a religious text. Furthermore, while the direct impact of CLS’s membership policy might be to exclude certain people from that student group, the indirect impact of CLS’s recognition of a student group maintaining such a policy is that SIU, intentionally or not, may be seen as tolerating such discrimination. Given that universities have a compelling interest in obtaining diverse student bodies, requiring a university to include exclusionary groups might undermine their ability to attain such diversity.. As the Supreme Court noted in Grutter v. Bollinger, 539 U.S. 306, 328-29, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (internal citations omitted):
The Law School’s educational judgment that such diversity is essential to its educational mission is one to which we defer. The Law School’s assessment that diversity will, in fact, yield educational benefits is substantiated.... Our scrutiny of the interest asserted by the Law School is no less strict for taking into account complex educational judgments in an area that lies primarily within the expertise of the university. Our holding today is in keeping with our tradition of giving a degree of deference to a university’s academic decisions, within constitutionally prescribed limits. We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition. In announcing the principle of student body diversity as a compelling state interest, Justice Powell invoked our cases recognizing a constitutional dimension, grounded in the First Amendment, of educational autonomy: “The freedom of a university to make its own judgments as to education includes the selection of its student body.” ... Our conclusion that the Law School has a compelling interest in a diverse student body is informed by our view that attaining á diverse student body is at the heart of the Law School’s proper institutional mission, and that “good faith” on the part of a university is “presumed” absent “a showing to the contrary.”
Thus, even if SIU’s AA/EEO policy somehow infringes upon a First Amendment right of CLS or its members, that infringe *876 ment may be justified if it is in furtherance of a compelling state interest, or, at the least, must be balanced against the harm to SIU from being forced to accept into its expressive association a group that undermines its message of nondiscrimination and diversity. To take away SIU’s ability to enforce its nondiscrimination policy may undermine “[t]he freedom of a university to make its own judgments as to education.”
Far from undermining this point, the Supreme Court’s recent decision in FAIR, — U.S.-, 126 S.Ct. 1297, 164 L.Ed.2d 156, underscores the interest of SIU and its Law School in their own speech, and their own associational rights. In FAIR, the Court drew a sharp distinction between the speech of outsiders, including the military recruiters whose policy toward gays and lesbians conflicted with that of the law schools, and the speech of members of the community:
But recruiters are not part of the law school. Recruiters are, by definition, outsiders who come onto campus for the limited purpose of trying to hire students — not to become members of the school’s expressive association. This distinction is critical. Unlike the public accommodations law in Dale, the Solomon Amendment does not force a law school to accept members it does not desire.
126 S.Ct. at 1312 (internal quotations and citations omitted). Here, CLS is trying to do exactly that: it is trying to force SIU’s Law School to accept a “member” (that is, a recognized student organization) that SIU does not desire. The whole point of this litigation is to transform CLS from an outsider, like the military recruiters in FAIR, into an insider.
In my view, the district court was entitled to conclude that this is a weighty interest on the side of the University. Because CLS has failed to show a likelihood of success on the merits and because it has no fundamental right to the benefits SIU believes should be withheld from it as long as it does not comply with the affirmative action policy, I would find that the district court did not abuse its discretion when it refused to grant the preliminary injunction. I therefore respectfully dissent.